CODRAY v. BROWNELL.

No. 11641.

United States Court of Appeals District of Columbia Circuit.

Argued May 18, 1953.

·Decided Oct. 15, 1953.

Mr. David Cobb, Washington, D. C., for appellant.

Mr. George B. Searls, Atty., Department of Justice, Washington, D. C., with whom Mr. John F. Cushman, Atty., Department of Justice, Washington, D. C., was on the brief, for appellee. Messrs. Leo A. Rover, U. S. Atty., Charles M. Irelan, U. S. Atty. at the time the brief was filed, and William R. Glendon, Asst. U. S. Atty. at time of argument, Washington, D. C., also entered appearances for appellee.

Before CLARK, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

This appeal requires consideration of the Treaty of Peace with Hungary and the Trading with the Enemy Act.[1] The principal question is whether those measures require the Alien Property Custodian[2] to seize and liquidate certain blocked assets of a Hungarian corporation and to pay from the net proceeds thereof an American citizen's prewar debt claim theretofore allowed under § 34 of the Act, the creditor having also attached the blocked assets in a state court suit against the foreign debtor; or whether the Custodian is under a legal duty to unblock the frozen assets of the Hungarian corporation for the benefit of its American creditor by licensing him to enforce collection there-

---

1. The Treaty, which became effective September 15, 1947, is in 61 Stat. at page 2109. The Act will be found in 50 U.S. C.App. § 1 et seq.

2. Administration of blocked assets was first given to the Secretary of the Treasury. Executive Order No. 8389, 5 Fed.Reg. 1400 (1940), 12 U.S.C.A. § 95a note. After the vesting power was added to the blocking authority, 55 Stat. 839, December 18, 1941, the President established the office of Alien Property Custodian, with the duty of administer-

ing vested assets. Executive Order No. 9095, 7 Fed.Reg. 1971 (1942), 50 U.S. C.A.Appendix, § 6 note. The office of the Alien Property Custodian was terminated by Executive Order No. 9788, 11 Fed.Reg. 11981 (1946), and its functions were transferred to the Attorney General. By Executive Order No. 9989, 13 Fed.Reg. 4891 (1948), the administration of blocked assets was also transferred to the Attorney General. Both the blocked and vested assets are now under that official.

from through his state court attachment. A second question, the answer to which depends upon the answer to the first, is whether this is a suit against the United States to which it has not consented.

Executive Order No. 8711 (6 Fed. Reg. 1443),* issued March 13, 1941, under the authority of § 5(b) of the Act, prohibited the transfer of property in this country owned by Hungarian nationals except when licensed by the Secretary of the Treasury. The Order blocked the assets of United Incandescent Lamp and Electrical Company, Ltd., a Hungarian corporation which was then and still is substantially indebted to Jacques Codray, an American citizen. In 1944, acting under § 5(b), the Alien Property Custodian seized or vested an account owed United by a New York corporation and collected thereon the sum of $37,457.35.

In 1950, Codray's claim filed with the Custodian under § 34 of the Act was allowed to the extent of $56,620.50, and the sum of $28,560.83 was paid to him from the proceeds of the United asset.

The appellant later discovered that two New York banks were holding for United certain assets said to be worth more than $200,000. He sued the Hungarian corporation in a New York state court on January 9, 1951, attached the property held by the two banks, and thereafter, on January 22, 1951, applied to the Office of Alien Property[3] for a license authorizing the New York sheriff to take possession of the attached frozen assets. The application was denied "for the reason that it involves property in which there is a Hungarian interest, the disposition of which is subject to the determination of over-all governmental policy."

On May 2, 1952, the New York state court awarded Codray judgment against United in the sum of $62,434.66. Claiming he had acquired an interest in the frozen assets through the attachments and the subsequent judgment, so that he is entitled to have his judgment debt paid therefrom, Codray sued the Attorney General in the United States District Court for the District of Columbia, praying that that official be required to

"* * * at his election either issue a license to the plaintiff authorizing the satisfaction and payment of his judgment against United or vest the property blocked in the name of United and pay and satisfy plaintiff's judgment against United in accordance with the aforesaid Determination and Representation[4] of the defendant."

The Attorney General moved to dismiss on the ground that the action was one against the United States which had not consented to be sued, that the court lacked jurisdiction over the subject matter, and that the complaint failed to state a claim upon which relief could be granted. He also moved for summary judgment, with supporting affidavits which set out in detail the problems concerning blocked Hungarian assets which were posed by the Treaty of Peace with Hungary and that nation's subsequent course of conduct. Codray also moved for summary judgment on the basis of the pleadings and the Attorney General's supporting affidavits. The District Court dismissed the action as being against the United States, unconsented to by it. Codray appeals.

The Attorney General contends this is a suit against the United States as it seeks to compel an officer to act affirmatively and officially in behalf of the government; and that since the United States has not consented to be sued, the action was properly dismissed by the District Court. The appellant argues, however, that Congress has directed the Custodian to vest and liquidate all

---

* 12 U.S.C.A. § 95a note.

3. A division in the Attorney General's office.

4. This had reference to the allowance of Codray's claim against United under § 34 partially satisfied from the vested asset which was distributed.

blocked Hungarian assets, and to pay from the proceeds the claims of prewar creditors allowed under § 34 of the Act; that it is therefore the Custodian's duty to vest and liquidate United's blocked assets, and then to pay his claim which has already been allowed under § 34. If that be true, this is an action against a recalcitrant official to force him to perform a statutory duty, and is not a suit against the government.

 In support of his theory, appellant contends for two propositions: (a) that Article 29 of the Treaty of Peace with Hungary[5] commands the Custodian to vest and liquidate all Hungarian assets; and (b) that the Article requires him then to dispose of the proceeds in accordance with the Trading with the Enemy Act. We need not consider the validity of appellant's proposition (a) because in any event proposition (b) that the proceeds are required to be devoted first to the payment of prewar debt claims under § 34 of the Act, must be rejected. The Article contains no such injunction but is clearly to the contrary. It provides that Hungarian assets shall be devoted to the payment of the claims of the United States and its nationals against Hungary and its nationals. By express provision, the word "claims" includes, but is not limited to, debts. Obviously, the Article must somehow be implemented by provision for the determination of all claims, both governmental and individual, and for decision as to priority.[6] The Trading with the Enemy Act, which antedates the Treaty, was not intended to, and does not, provide procedures for those purposes. It deals only with individual debt claims and with the disposition of assets vested *under the Act.* The vesting contemplated by Article 29 is not the statutory vesting, but has a much broader purpose.

 To construe the Article as requiring that Hungarian assets be applied first to the payment of individually owned debt claims, as appellant would have us construe it, would amount to judicial legislation. It would be a de-

---

5. Paragraphs 1 and 2, which are the pertinent parts of Article 29 of the Treaty, are as follows:

"1. Each of the Allied and Associated Powers shall have the right to seize, retain, liquidate or take any other action with respect to all property, rights and interests which at the coming into force of the present Treaty are within its territory and belong to Hungary or to Hungarian nationals, and to apply such property or the proceeds thereof to such purposes as it may desire, within the limits of its claims and those of its nationals against Hungary or Hungarian nationals, including debts, other than claims fully satisfied under other Articles of the present Treaty. All Hungarian property, or the proceeds thereof, in excess of the amount of such claims, shall be returned.

"2. The liquidation and disposition of Hungarian property shall be carried out in accordance with the law of the Allied or Associated Power concerned. The Hungarian owner shall have no rights with respect to such property except those which may be given him by that law."

6. We quote the following from one of the affidavits filed by the Attorney General in support of his motion for summary judgment:

"According to the information available to the Department of State the claims of Americans against Hungary, including war damage claims, debts, and nationalization claims, far exceed in amount the value of the Hungarian assets now 'blocked' under Executive Order No. 8389, as amended, so that the interpretation and application of Article 29 of the Treaty presents a problem in equitable distribution or allocation. Thus, there is a problem of a difference of treatment for different categories of creditors, dependent on the time of presenting claim, as well as the relative priorities to be established between creditors on the one hand and claimants for war damage and nationalization on the other hand, either generally or for particular situations. In addition, there is the question of what assets should be vested and whether there should be a difference of treatment dependent on whether the assets are owned by the Hungarian Government or private individuals and, if by the latter, whether any difference of treatment should be accorded dependent on the presence of the individual outside of Hungary and his political attitudes."

termination that debt claims such as Codray's have priority over claims of the United States and over individual claims not based on debts. We have no authority to make that determination. Impatient individual creditors cannot now assert rights under Article 29. They must wait until implementing machinery has been set up by appropriate governmental action. It follows that the Article does not confer upon Codray the right to compel the Custodian to vest United's assets and pay his claim therefrom.

Aside from his reliance upon the Treaty, appellant argues that, since his claim has been allowed by the Custodian, §§ 7(b), 9(a) and 34 of the Act require that official to give him the relief which he seeks.

Section 34 provides that vested property, or the net proceeds thereof "shall be equitably applied by the Custodian in accordance with the provisions of this section to the payment of debts owed by the person who owned such property or interest immediately prior to its vesting * * *." The section further provides:

" * * * The Custodian shall not be required through any judgment of any court, levy of execution, or otherwise to sell or liquidate any property or interest vested in or transferred to him, for the purpose of paying or satisfying any debt claim."

The determination and allowance of Codray's claim made him eligible to receive payments from the fund derived from the liquidation of United's assets then or thereafter vested under the Act; but the allowance did not require that United's blocked assets be vested for that purpose.

Section 7(b) [7] does not help the appellant. It expressly recognizes the blocking power by forbidding payment without the license of the President.

By the terms of § 9(a), subject however to enumerated conditions, "Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been" vested in or transferred to the Custodian, or to whom a debt may be owing by an enemy or ally of enemy whose property has been vested in or transferred to the Custodian, may institute a suit in equity

" * * * to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment, conveyance, transfer, assignment, or delivery to said claimant of the money or other property so held by the Alien Property Custodian * * *."

The Custodian must be made a party defendant.

It is apparent that § 9(a) has no application here. It deals with vested assets and not with those that are merely blocked. Moreover, Codray could not proceed under that section even if United's assets were now vested, because the Supreme Court has held that a blocking order prevents a creditor from thereafter acquiring by attachment an "interest, right or title" in property such as will support a claim against the Custodian under § 9(a) of the Act after the attached asset is later vested.[8]

7. The portion of § 7(b) regarded by the appellant as pertinent is the following: "Nothing in this Act * * * shall be deemed to prevent payment of money belonging or owing to an enemy or ally of enemy to a person within the United States not an enemy or ally of enemy, for the benefit of such person or of any other person within the United States, not an enemy or ally of enemy, if the funds so paid shall have been received prior to the beginning of the war and such payments arise out of transactions entered into prior to the beginning of the war, and not in contemplation thereof: *Provided,* That such payment shall not be made without the license of the President, general or special, as provided in this Act * * *."

8. Orvis v. Brownell, 1953, 345 U.S. 183, at page 189, 73 S.Ct. 596, at page 599. The opinion concludes thus: "Petitioners by their unlicensed attachment could obtain no 'interest, right, or title' in this fund recoverable against the Custodian. He may proceed to ad-

We do not find in the sections cited, or elsewhere in the statute, anything which can be construed as a command that the President take affirmative action as to blocking, vesting, unblocking or licensing. In deciding whether or not to take such action, the President determines governmental policy; in acting he acts for the government. So, when Codray sues to compel the Attorney General [9] to act affirmatively for the government, he is not suing to force an officer to perform a legal duty, but to force him to take governmental action which the statute permits but does not require. In other words, this suit is in effect against the United States. Larson v. Domestic & Foreign Commerce Corp., 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L. Ed. 1628. As it has not consented to be sued, the action should have been, as it was, dismissed.

Affirmed.

minister the vested assets according to § 34 of the Act and to consider petitioners' claim and its status thereunder, subject to the review therein provided. The suit under § 9(a), however, must fail."

9. The Attorney General is simply acting as the President's representative—his "voice and conscience." Cf. Ludecke v. Watkins, 1948, 335 U.S. 160, 165–166, 68 S.Ct. 1429, 1432, 92 L.Ed. 881.