356 F.2d 351
 Masae KONDO et al., Appellants,
v.
Nicholas deB. KATZENBACH, Attorney General of the United States, Appellee.
Masaru OKAMOTO et al., Appellants,
v.
Nicholas deB. KATZENBACH, Attorney General of the United States, Appellee.
Ayako HONDA et al., Appellants,
v.
Nicholas deB. KATZENBACH, Attorney General of the United States, Appellee.
 Nos. 19282-19284.
 United States Court of Appeals District of Columbia Circuit.
 Argued October 12, 1965.
 Decided January 13, 1966.
 Petition for Rehearing En Banc Denied February 24, 1966.
 
 Mr. John Silard, Washington, D. C., and Mr. Fred Okrand, Los Angeles, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Messrs. Joseph L. Rauh, Jr., Washington, D. C., and A. L. Wirin, Los Angeles, Cal., were on the brief, for appellants.
 Mr. David L. Rose, Attorney, Department of Justice, for appellee. Mr. John W. Douglas, Asst. Atty. Gen., and Messrs. Sherman L. Cohn, Anthony L. Mondello and Armand B. DuBois, Attorneys, Department of Justice, were on the brief, for appellee.
 Before DANAHER, WRIGHT and TAMM, Circuit Judges.
 TAMM, Circuit Judge:
 
 
 1
 * Presented to us in these cases, consolidated for hearing, is a precise question: Did the District Court correctly dismiss the appellants' complaints on the ground that the court lacked jurisdiction of the subject matter of the actions because the complaints were not filed within the 60-day limitation period prescribed by section 34(f) of the Trading with the Enemy Act (60 Stat. 925, 50 U.S.C. App. § 34(f))? (See Appendix A at 359-360.)
 
 
 2
 The three actions under review were filed in the District Court in May and July of 1964 and seek to set aside the dismissal by the Attorney General of appellants' debt claims based upon their deposits of yen in the American branches of the Yokohama Specie Bank, Ltd. Except for the claimant internees or parolees in No. 19,283, appellants are several thousand Americans of Japanese ancestry who, residing in the United States, had, prior to December 7, 1941, made deposits in the American branches of the Yokohama Specie Bank, Ltd. The property in the United States of this Japanese bank was vested as Japanese Enemy Property under the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq. After liquidation by state superintendents of banks, there remained approximately $17 million, which was turned over to the Office of Alien Property.
 
 
 3
 Congress, on August 8, 1946, enacted section 34 of the Trading with the Enemy Act, which authorized the Alien Property Custodian[1] to pay from the proceeds of vested property the debts of former owners of the vested property that were due and owing on the vesting date. Congress excluded from the benefits of this statute, among others, individuals and their successors who had been interned or paroled as potentially dangerous alien enemies under the Alien Enemy Act, 50 U.S.C. § 21.
 
 
 4
 Acting under section 34(b) of the Trading with the Enemy Act, the Alien Property Custodian fixed November 18, 1949, as the final date for filing debt claims with the Custodian against the funds of the Yokohama Specie Bank, Ltd. Approximately ten thousand debt claims were timely filed, of which some seven thousand, five hundred were based on yen deposits. Appellants in the present cases all filed claims in the amount of their deposits during this period. The aggregate of the claims exceeded the seized assets of the bank, necessitating a processing of the claims under section 34 (f) of the Act relating to insolvent debtors' estates. Claims of persons who had been interned or paroled under the Alien Enemy Act (50 U.S.C. § 21) were dismissed because of the express provision of section 34(a) of the Trading with the Enemy Act (see Appendix A at 359), which excluded such persons from the status of eligible debt claimants. This action constituted the final disposition under the Act of the claims of the appellants in case number 19,283.
 
 
 5
 Extensive hearings before an Examiner were conducted, and ultimately, in 1957, the Alien Property Custodian ruled that the claims were allowable at the post-war rate of exchange of 361.55 yen to the dollar under the "Judgment Day" rule of Die Deutsche Bank v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926), since the deposits were payable in yen in Japan. Thereafter, identical registered letters were sent to all eligible claimants,[2] numbering some seven thousand, five hundred, stating that their claim could be allowed at the 361.55 rate and requesting that the claimants' original yen certificates be submitted to the Office of the Alien Property Custodian. This letter was received by all appellants represented in cases number 19,282 and 19,284. The claims of appellants in case number 19,283 had been rejected initially, as heretofore indicated, and they were not recipients of the letter. A copy of the registered letter appears in Appendix B of this opinion.
 
 
 6
 Some further summation of the contents of the letter received by the claimants is essential to a consideration of the contentions of appellants in the Honda (No. 19,284) and Kondo (No. 19,282) cases. The letter, in addition to the provisions set forth above, informed these appellants that they might, if they wished, file a statement of their objections to the application of the 361.55, or post-war, rate of exchange. The letter informed claimants that if their original certificates were not submitted within the designated period, or if an explanation of why the certificates could not be submitted was not timely submitted, the claim would be dismissed as having been abandoned. The letter also set forth that a schedule of claimants would be drawn up from the names of persons submitting their original deposit certificates or explanations. Included in the letter was the statement that "[w]ithin sixty days after the issue of the schedule any aggrieved claimant may file in the District Court of the United States for the District of Columbia a complaint for review of such schedule, naming the Attorney General as defendant. If no complaint for review is filed, payments will be made in accordance with the schedule."
 
 
 7
 Thereafter, one thousand, eight hundred seventeen deposit claims against the Yokohama Specie Bank, for which either original certificates of deposit or satisfactory evidence of loss had been submitted, were allowed at the rate of 361.55 yen to the dollar. Carrying out the provision of section 34(f) of the Act (see Appendix A at 359-360, the Alien Property Custodian prepared and served by registered mail on all claimants (id est, allowed and dismissed claims and including claimants in cases 19,282, 19,283 and 19,284) a Final Schedule of all debt claims allowed and the proposed payment to each claimant. Claimants whose claims had been dismissed, including appellants in the Okamoto case (No. 19,283) were not listed on the Final Schedule. Included with the notice transmitting the Final Schedule to each claimant was the statement:
 
 
 8
 "Pursuant to Section 34(f) of the Trading with the Enemy Act, as amended, any claimant considering himself aggrieved by this Final Schedule may, within sixty (60) days from the date of the mailing of the Schedule, file in the United States District Court for the District of Columbia a complaint for review of this Schedule, naming the Attorney General as defendant. A copy of such complaint must be served on the Attorney General and on each claimant named in the Schedule. If no such complaint for review is filed within the sixty-day period, payments to claimants will be made by this Office as specified in the Final Schedule."
 
 
 9
 A timely complaint for review of the award was brought in the United States District Court for the District of Columbia in 1961 asserting that the claims should have been allowed by the Custodian at the pre-war dollar rate of exchange for yen. This action (Abe v. Kennedy, C.A. 2529-61) was pursued in behalf of all Yokohama Specie Bank yen deposit claimants whose claims had been allowed on the Final Schedule. Proceedings in the Abe case were postponed, however, pending the outcome of a companion case, Aratani v. Kennedy, C.A. 3164-58, which had been filed in 1958 and which related to the yen deposit claims which had been asserted against vested funds of the Sumitomo Bank, Ltd. The chronology and disposition of this case are set forth in the court's opinion published in 115 U.S.App.D.C. at page 97 and in 317 F.2d at page 161. The opinion affirming summary judgment in favor of the Government certainly invited certiorari, and on October 21, 1963, the Supreme Court granted certiorari, 375 U.S. 877, 84 S.Ct. 147, 11 L.Ed.2d 110. Before disposition by the Supreme Court, however, the Attorney General settled the Sumitomo Bank, Ltd. case on an exchange rate much more favorable to the claimants and simultaneously, or virtually so, settled the yen deposit claims on the Final Schedule of the Yokohama Bank case at a rate approximating a net return to the claimants of 49 per cent of the amount claimed. The settlements were approved in the United States District Court for the District of Columbia on May 18, 1964,[3] 228 F.Supp. 706. After payment of the settlement sums, about $10 million remains in the Yokohama Specie Bank, Ltd. account in the Office of Alien Property.
 
 
 10
 Against this background, the identity of the appellants in our present cases comes into sharper focus. In the Kondo (No. 19,282) and Honda (No. 19,284) cases, we have before us several thousand depositors in the Yokohama Specie Bank who, although recipients of the notices heretofore described as issuing from the Alien Property Custodian, declined or failed to file their original deposit certificates with the Custodian. Whatever reasons may have prompted or caused this action, these depositors were not listed on the Final Schedule for payment, were not represented in the court action entitled Abe v. Kennedy, supra, and were not included in the settlement effectuated by the District Court approval of May 18, 1964. By actions filed in the District Court in the Honda case on May 19, 1964, and in the Kondo case on July 9, 1964, these appellants sought to compel the Attorney General to pay to them on their deposits in the Yokohama Specie Bank a pro rata amount from the funds remaining in the Bank's vested account upon the same basis as was paid to the claimants in the Abe case. Similarly, in the Okamoto case, No. 19,283, in a complaint filed in the District Court on July 6, 1964, appellants, as depositors in the Yokohama Specie Bank whose claims were disallowed on the ground that they had been interned and paroled as alien enemies, seek a like portion of the remaining vested funds.
 
 
 11
 The District Court, on March 31, 1965, dismissed all three actions on the ground that the court lacked jurisdiction over the subject matter of the actions because they were not commenced within the time set forth in section 34(f) of the Trading with the Enemy Act (50 U.S.C. App. § 34(f)).
 
 II
 
 12
 Appellants in the Kondo and Honda cases contend that the District Court should have invoked equitable estoppel against the 60-day limitation period; that estoppel is applicable to suits arising under the Trading with the Enemy Act; that the sovereign immunity doctrine contains nothing warranting an implied exemption for the Government from the estoppel principle of Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959); and exemption from the Glus estoppel doctrine creates a constitutional issue under the just compensation provisions of the Fifth Amendment. We treat first the presentation of these appellants.
 
 III
 
 13
 Basing their first argument on a chronological treatment of the events transpiring between December 7, 1941 and March 31, 1965, these appellants argue that the 1958 letter of the Custodian to each claimant was a "discouragement" and "insult" to the claimants, who had waited 17 years for the money seized by the vesting procedure. Concluding that the text of this letter was confusing, insulting and arbitrary, appellants argue that they were not told why their original certificates surrender was being demanded and why only two per cent of their deposits were being refunded, with a resulting inference that a surrender of the original certificate would constitute acquiescence in the two per cent formula and a waiver of further rights of the claimants. Appellants argue that their original certificates constituted their sole tangible remaining evidence of a claim, and because of illiteracy, language difficulties and other similar reasons they were reluctant to take any step which might either result in a loss of their claim or require them to accept a two per cent award. Accordingly, say this group, they awaited the outcome of the Abe v. Kennedy case "reasonably anticipa[ting] that if the two per cent formula which had long been in administrative litigation in Abe were reversed in the court all Yokohama Bank depositors who had filed timely claims under the act which the Government had recognized as valid would be similarly compensated." Appellants conclude that their refusal to file their original deposit certificates and that their failure to sue or join in a suit while Abe was in litigation was "excusable delay" in view of their reasonable reliance upon the Government to treat them equally with claimants in the Abe case, especially since no prejudice accrued to the Government between 1961 and 1964 as a result of these appellants' inactivity.
 
 
 14
 In answer, the appellee points out that these actions arising under the Trading with the Enemy Act are suits against the Government. All conditions of the sovereign's consent to be sued must be complied with, and the failure to satisfy any such condition is fatal to the court's jurisdiction. Since the provision of section 34(f) of the Act creates a 60-day limitation upon the period in which a depositor may establish his status as a claimant or take other action, failure to meet this condition constitutes a fatal failure to meet a prescribed condition precedent to the maintenance of the action.
 
 
 15
 There is no doubt that this action is a suit against the United States. Banco Mexicano v. Deutsche Bank, 263 U.S. 591, 602-603, 44 S.Ct. 209, 68 L.Ed. 465 (1924); Codray v. Brownell, 93 U.S.App. D.C. 112, 207 F.2d 610 (1953), cert. denied 347 U.S. 903, 74 S.Ct. 428, 98 L.Ed. 1063 (1954). It is equally as well established that failure to satisfy the conditions of the United States' sovereign consent to be sued is fatal to the court's jurisdiction. Brownell v. Morizo Nakashima, 243 F.2d 787 (9th Cir.), cert. denied 355 U.S. 872, 78 S.Ct. 117, 2 L.Ed.2d 77 (1957); Cisatlantic Corp. v. Brownell, 131 F.Supp. 406 (S.D.N.Y.1953), aff'd 222 F.2d 957 (2d Cir. 1955); Von Clemm v. Smith, 204 F.Supp. 110 (S.D.N.Y. 1962).
 
 
 16
 The 1958 letter attacked by appellants is set forth in the appendix of this opinion. (See Appendix B.) The appellee explains the necessity for requiring that the depositors submit their original certificates of deposit by pointing out that the certificates were redeemable to the holder by the banks in Japan, and in numerous cases had been so redeemed, and existence of the original certificates in the claimants' hands was essential to the establishment of an unsatisfied debtor status and in order to avoid double payment. The letter followed in meticulous detail and with painstaking care the requirements of the statute in notifying each of the thousands of depositors, not only of the Custodian's proposal but of the depositors' rights to file objections to the proposal and to initiate court action if they so desired. As heretofore set forth, the 60-day statutory limitation was set forth specifically and accurately. We question that the Custodian could more completely have outlined the significance of the proposal, creation and status of the forthcoming Final Schedule of Allowed Claims and the rights of the appellants under the statute. To characterize this letter as insulting requires an emotional approach unwarranted by the letter. That it was discouraging to its recipients is obvious. Those recipients were told, however, of the action which they could take if they desired. In some instances, their attorneys were also informed. Their failure to act cannot, we feel, be attributed to any misrepresentation, either affirmatively or negatively, by the appellee. Whatever may have prompted the appellant's action, or lack of action, we conclude it was not any misleading act or inaction on the part of the Government.
 
 IV
 
 17
 Appellants' contention that estoppel is applicable to suits arising under the Trading with the Enemy Act faces immediately our holding that "estoppel cannot be used against the Federal Government" in Legerlotz v. Rogers, 105 U.S. App.D.C. 256, 266 F.2d 457, 459 n. 5 (1959), cert. dismissed 362 U.S. 938, 80 S.Ct. 803, 4 L.Ed.2d 768 (1960). That case also involved a suit for the return of vested property under the Act involved in the present case. Similar holdings may be found in Anderegg v. United States, 171 F.2d 127 (4th Cir. 1948), cert. denied 336 U.S. 967, 69 S.Ct. 937, 93 L.Ed. 1118 (1949); Wallace v. United, States, 142 F.2d 240 (2d Cir.), cert. denied 323 U.S. 712, 65 S.Ct. 37, 89 L.Ed. 573 (1944).
 
 V
 
 18
 Next, these appellants reason that Glus v. Brooklyn Eastern District Terminal, supra, contains nothing warranting the conclusion that the appellee is excepted from the estoppel principle enunciated therein. We observe, first, that the Government was not a party in the Glus case. Secondly, the Glus opinion is based upon an affirmative claim that the respondent had made a misrepresentation to the petitioner, thereby misleading him into a course of non-action. Utilizing the basic concept that no man may take advantage of his own wrong, the Supreme Court reversed in order to permit the petitioner to show whether he could, in fact, make out a case calling for the application of the doctrine of estoppel. The Glus case, however, does not pretend to announce any new or extended doctrine. Mr. Justice Black quotes in Glus, with approval, a statement of basic principle from Insurance Company v. Wilkinson, 80 U.S. (13 Wall.) 222, 233, 20 L.Ed. 617 (1871) wherein Mr. Justice Miller said:
 
 
 19
 "The principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court of justice be permitted to avail himself of that advantage. And although the cases to which this principle is to be applied are not as well defined as could be wished, the general doctrine is well understood and is applied by courts of law as well as equity where the technical advantage thus obtained is set up and relied on to defeat the ends of justice or establish a dishonest claim."
 
 
 20
 We do not believe that the factual record before us permits a conclusion that the appellee "by his representations or his conduct induced" the appellants to give appellee any advantage. This being so, the question of whether the doctrine of estoppel restated in Glus is operative against the Government, or more specifically against this appellee, does not enter this case.
 
 
 21
 Insofar as appellants attempt to relate the estoppel principle of the Glus case, we refer back to the discussion of this factor in section III of this opinion and conclude that the record does not support appellants' contention on this point.
 
 VI
 
 22
 Approaching their difficulties from the constitutional viewpoint, these appellants argue that the Fifth Amendment, in providing for due process, precludes the Government from any arbitrary or unreasonable intrusion upon private rights and requires that the Government be held to the highest standards of fairness and reasonableness, and they cite Communist Party v. Subversive Activities Control Board, 351 U.S. 115, 76 S. Ct. 663, 100 L.Ed. 1003 (1956); Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950); Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), in support of this principle. Continuing, appellants charge that appellee's action with reference to their deposits in the Yokohama Bank constitutes a Government seizure of private property without judicial process. Citing Central Union Trust Co. v. Garvan, 254 U.S. 554, 566, 41 S.Ct. 214, 65 L.Ed. 403 (1921), the argument continues that the qualification of the alien property seizure therein is valid only "if adequate provision is made for a return in case of mistake" establishes a standard of "adequate provision," which because of the application of the 60-day limitation clause has not been met in this case.
 
 
 23
 The appellee denies in rather general terms the existence of a constitutional issue in these cases.
 
 
 24
 The record supports the appellee's argument that the property taken and vested by the Custodian was the property of the Yokohama Specie Bank and not the property of the appellants. That deposits in banks become property of the bank and create a debtor-creditor relationship between bank and depositor is universally recognized. See e. g., Anderson National Bank v. Luckett, 321 U.S. 233, 64 S.Ct. 599, 88 L.Ed. 692 (1944); Killoren v. First National Bank, 127 F.2d 537, 541 (C.C.A.8th Cir. 1942); Cicero State Bank v. Crowley, 115 F.2d 1022 (C.C.A.7th Cir. 1940). It follows that the property of the appellants — that is, the debt to them of the Yokohama Specie Bank — still belongs to appellants and has never been seized by the Custodian. The existence of this property in the control and possession of the appellants is further emphasized by the fact, heretofore pointed out, that each appellant may recover in Japan from the Yokohama Specie Bank on the basis of his original deposit certificate, albeit at a rate of exchange not pleasing or acceptable to him.
 
 
 25
 The constitutional question may be viewed from another viewpoint. Appellants are creditors of a wartime enemy commercial enterprise. The American-based assets were legally vested by valid Act of Congress. Thereafter, as a matter of grace, Congress, by enacting section 34 of the Act, conferred upon certain creditors of enemy enterprises a means of attempting to recover upon their claims from those assets of the debtor which were held by the Custodian. The action did not, however, create a constitutional right in the creditors to recover. The practical effect of section 34 is to provide a means of pro rata distribution of vested funds among those claimant-creditors who are able under the statute to establish their right to this recovery. Certainly, the creditors have not acquired by section 34 of the Act a property right in vested funds.
 
 
 26
 We conclude that the appellants have not been deprived of any constitutional right by the appellee in these proceedings.
 
 VII
 
 27
 Turning now to the Okamoto case, we recall that this group of appellants are the depositors in the Yokohama Specie Bank whose claims were rejected by the appellee because these people had been interned and paroled and were, consequently, barred by the statute from recovery of their deposits. It is argued on behalf of these appellants that the Government, to their detriment, is taking an inconsistent and consequently illegal position by first claiming the Trading with the Enemy Act created no rights for appellants and "does not apply to them," in permitting the processing of their deposit claims, but later claiming that the Act's 60-day limitation clause does apply to appellants when they seek through the courts to press their suit. On this basis, these appellants, relying on Interstate Commerce Comm. v. United States ex rel. Humboldt Steamship Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849 (1912), argue that the courts have authority in this case by mandamus to compel the Custodian to accept the claims of appellants and to proceed to the merits of their claim. In advancing this argument, the appellants emphasize the distinction between the exercise of an agency's discretionary power and a denial of power from a misunderstanding of the law.
 
 
 28
 Our review of the Humboldt Steamship Co. case establishes a vital distinction from the situation that confronts us here. In Humboldt, the Interstate Commerce Commission "refused to proceed at all, though the law required it to do so," 224 U.S. at 485, 32 S.Ct. at 559. Here, the Custodian exercised jurisdiction initially over these appellants' claims. The claims were reviewed and dismissed on the ground of ineligibility of the claimants under the provisions of the Act. Jurisdiction was exercised, and it was adverse to appellants. Under these circumstances, proceedings in the nature of mandamus will not lie. But, say these appellants, mandamus will lie where "* * * the erroneous decision cannot be reviewed on appeal or writ of error," citing United States ex rel. Louisville Cement Co. v. Interstate Commerce Comm., 246 U.S. 638, 643, 38 S.Ct. 408, 409, 62 L.Ed. 914 (1918). Unfortunately for this approach, we have in the present case statutory provision for review of the Custodian's action in rejecting the claims of these appellants. Section 34(f) of the Act provides a remedy which is an exclusive one and one which the claimants failed to utilize, although complaint for review was brought by a similary situated depositor in another vested Japanese bank case. See Sasaki v. Rogers, 185 F.Supp. 191 (D.D. C. 1960).
 
 
 29
 A further contention of this group of claimants is that the Fifth Amendment prevents dismissal of their claims. Again, the short — and we think obvious — answer to this argument is that if the appellants desired to contest the constitutionality of the eligibility provisions of section 34(a) of the Act, they could, and should, have filed a timely complaint for judicial review.
 
 VIII
 
 30
 We conclude upon the entire record in all three cases that the District Court acted correctly in dismissing these cases on March 31, 1965.
 
 IX
 
 31
 The unique and unfortunate circumstances which have deprived these appellants of their deposits in the Yokohama Specie Bank command sympathetic consideration of their problem. Arguments made to the court were broadly spiced with a strong emotional appeal. Appellants' sincere counsel valiantly attempted under the label of "equitable considerations" to lead the court to abandon established legal principles and upon purely humane grounds return to the appellants the funds which represented their savings on December 7, 1941. Benevolence is a noble virtue, but it cannot be a foundation for legal opinions, regardless of the need of the litigant or the strictly emotional appeal of his plight. It is not for the courts to turn their backs upon legal principles, precepts and established law in order to accomplish an end which is suggested by a desire to accomplish a humane objective. To do so would immediately constitute the creation of a program of judicial legislation in complete disregard of our constitutional limitations and separation of powers. Obviously, Congress, enacting into law the will of the people, must write our country's laws. The dangers of wartime, the military and economic problems of the early 1940's, are far behind us. Perhaps now the necessities that required the enactment of the Trading with the Enemy Act have so far passed into history that Congress may wish to reconsider the status of these appellants and another disposition of their claims. It is not for the court to suggest to Congress what it should or should not do. We suggest only that the relief sought by these appellants lies solely in legislative hands.
 
 
 32
 Affirmed.
 
 APPENDIX A
 
 33
 Section 34 of the Trading with the Enemy Act, 60 Stat. 925 (1946), 50 U.S.C. App. § 34 (1951).
 
 
 34
 Sec. 34(a). Any property or interest vested in or transferred to the Alien Property Custodian (other than any property or interest acquired by the United States prior to December 18, 1941), or the net proceeds thereof, shall be equitably applied by the Custodian in accordance with the provisions of this section to the payment of debts owed by the person who owned such property or interest immediately prior to its vesting in or transfer to the Alien Property Custodian. * * Debt claims allowable hereunder shall include only those of citizens of the United States or of the Philippine Islands; those of corporations organized under the laws of the United States or any State, Territory, or possession thereof, or the District of Columbia or the Philippine Islands; those of other natural persons who are and have been since the beginning of the war residents of the United States and who have not during the war been interned or paroled pursuant to the Alien Enemy Act; * * *.
 
 
 35
 Sec. 34(b). The Custodian shall fix a date or dates after which the filing of debt claims in respect of any or all debtors shall be barred, and may extend the time so fixed, and shall give at least sixty days' notice thereof by publication in the Federal Register. * * *
 
 
 36
 Section 34(f). If the aggregate of debt claims filed as prescribed exceeds the money from which, in accordance with subsection (d) hereof, payment may be made, the Custodian shall prepare and serve by registered mail on all claimants a schedule of all debt claims allowed and the proposed payment to each claimant. In preparing such schedule, the Custodian shall assign priorities in accordance with the provisions of subsection (g) hereof. Within sixty days after the date of mailing of such schedule, any claimant considering himself aggrieved may file in the District Court of the United States for the District of Columbia a complaint for review of such schedule, naming the Custodian as defendant. A copy of such complaint shall be served upon the Custodian and on each claimant named in the schedule. The Custodian, within forty-five days after service on him, shall certify and file in said court a transcript of the record of proceedings in the Office of Alien Property Custodian with respect to such schedule. Upon good cause shown such time may be extended by the court. Such record shall include the claims in question as filed, such evidence with respect thereto as may have been presented to the Custodian or introduced into the record by him, any findings or other determinations made by the Custodian with respect thereto, and the schedule prepared by the Custodian. The court may, in its discretion, take additional evidence, upon a showing that such evidence was offered to and excluded by the Custodian or could not reasonably have been adduced before him or was not available to him. Any interested debt claimant who has filed a claim with the Custodian pursuant to this section, upon timely application to the court, shall be permitted to intervene in such review proceedings. The court shall enter judgment affirming or modifying the schedule as prepared by the Custodian and directing payment, if any be found due, pursuant to the schedule as affirmed or modified and to the extent of the money from which, in accordance with subsection (d) hereof, payment may be made. Pending the decision of the court on such complaint for review, and pending final determination of any appeal from such decision, payment may be made only to an extent, if any, consistent with the contentions of all claimants for review.
 
 APPENDIX B
 
 37
 (J.A. 6)
 
 EXHIBIT A
 
 38
 REGISTERED MAIL
RETURN RECEIPT REQUESTED
Ayako Honda
1576 Valota Road
Redwood City, California
 
 Dear Sir:
 
 39
 Reference is made to the above-numbered debt claim which has been filed with this Office with respect to the insolvent account of the Yokohama Specie Bank Ltd. The claim is based upon yen certificates of deposit.
 
 
 40
 The Director of this Office decided on November 13, 1957, In the Matter of Kunio Abe et al., Claim No. 55507, Docket No. 55 D 72, which decision the Attorney General has declined to review, that yen certificates of deposit issued by the Yokohama Specie Bank, Ltd., and the Sumitomo Bank, Ltd. are obligations payable in yen in Japan, and that claims based on such certificates of deposit are to be allowed and paid in United States currency at the post war rate of exchange in accordance with the "Judgment Day" rule set forth in Die Deutsche Bank v. Humphrey, 272 U.S. 517 [47 S.Ct. 166, 71 L. Ed. 383] (1926). Thus, the current rate of exchange of 361.55 yen to one dollar must be used in converting the yen into a dollar amount. Interest is allowable from the date of deposit to the date of payment.
 
 
 41
 Therefore, if you submit your original certificates of deposit to this Office, I can recommend your claim for allowance in the sum of $9.09 plus interest. If you have lost your certificates, you should prepare a statement setting out that the deposits were made as alleged in the Notice of Claim form, giving the numbers of the certificates, the dates of the deposits, and the branch of the Bank at which the certificates were purchased. You should also state that you have not received payment from the Bank or accepted renewed certificates of deposit. This statement should be signed and sworn to by you before a Notary Public and forwarded to this Office in support of your claim.
 
 
 42
 (J.A. 7)
 
 
 43
 Payment of your claim, however, will not be made immediately. Under the procedures set forth in section 34(f) of the Trading with the Enemy Act, as amended (50 U.S.C. App. 34(f)); it is necessary that all of the approximately 9000 claims filed against the Yokohama Specie Bank, Ltd. be reviewed and a schedule issued showing the proposed payments before any payments can be made. Within sixty days after the issuance of the schedule, any aggrieved claimant may file in the District Court of the United States for the District of Columbia a complaint for review of such schedule, naming the Attorney General as defendant. If no complaint for review is filed, payments will be made in accordance with the schedule.
 
 
 44
 Advice received by this Office is to the effect that yen certificate of deposit accounts are carried on the books of the Yokohama Specie Bank, Ltd. in Japan, and the funds may be withdrawn in that country or transferred to the Bank of Tokyo, Ltd. Under the circumstances, you may wish to utilize the funds in Japan rather than await settlement by this Office. If this is done, the Notice of Claim filed with this Office should be canceled by signing and mailing the enclosed Notice of Cancellation of Claim card.
 
 
 45
 If, however, you wish to maintain your claim with this Office you are requested to submit the original certificates of deposit or the notarized statement as to why they cannot be forwarded. In the event you object to the allowance of your claim in the amount stated above, you should submit the certificates to this Office within the next forty-five days and file a statement specifying your objections, together with the reasons in support thereof. Upon receipt of your objections, if I consider them to be without merit, I shall apply to the Director of this Office, pursuant to section 502.25(1) of the Rules of Procedure for Claims, a copy of which is enclosed, for the entry of an Order allowing your claim in the principal amount stated above, plus interest, and dismissing any portion over and above that amount on the ground that there is no debt due and owing to you by the Yokohama Specie Bank, Ltd. in excess of that amount. In acting upon my application, the Director will consider the statement of objections that you may have submitted.
 
 
 46
 (J.A. 8)
 
 
 47
 On the other hand, if within the next forty-five days you do not submit the original certificates of deposit or a statement explaining why they cannot be forwarded, I shall conclude that the claim has been abandoned in its entirety and, without further notice to you, shall apply to the Director for the entry of an Order dismissing the claim on the ground of abandonment, pursuant to section 502.25(g) and (i) of the Rules of Procedure for Claims.
 
 To recapitulate:
 
 48
 1. If you wish to maintain your claim with this Office, you should within forty-five days forward the original certificates of deposit and, if you wish to do so, file a statement of your objections to the allowance of the claim in the amount stated above.
 
 
 49
 2. If you wish to maintain your claim but do not have the original certificates of deposit, you should within forty-five days submit a statement, signed and sworn to before a Notary Public, giving the details of the deposits and stating that you have not received payment or renewed certificates. If you wish to do so, you may also file a statement of your objections to the allowance of the claim in the amount stated.
 
 
 50
 3. I shall then apply to the Director for an Order allowing your claim in the principal amount stated above, plus interest, and dismissing any portion over and above that amount. Where objections have been filed, they will be submitted to the Director for his consideration in acting upon your claim.
 
 
 51
 4. If, within forty-five days, you do not submit the original certificates of deposit or an explanation as to why you cannot forward them, I shall conclude that the claim has been abandoned and shall apply to the Director for an Order dismissing the claim on that ground.
 
 
 52
 5. If you prefer to utilize the funds in Japan, you should sign and mail the enclosed Notice of Cancellation of Claim card in order to clear the records of this Office.
 
 
 53
 (J.A. 9)
 
 
 54
 Please note that the original certificates must be submitted; photostatic copies cannot be substituted.
 
 
 55
 Sincerely yours,
 ARTHUR R. SCHOR,
 Chief, Claims Section,
 Office of Alien Property.

Enclosures

cc: Wirin, Rissman & Okrand,
 257 South Spring Street,
 Los Angeles 12, California.
 
 
 
 Notes:
 
 
 [1]
 By Executive Order No. 9788 (October 14, 1946, 11 F.R. 11981), the Attorney General succeeded to the powers and duties of the Alien Property Custodian. The term "Custodian" or "Office of Alien Property" will be used to refer to the Alien Property Custodian, or the Attorney General as successor, as the context may require
 
 
 [2]
 The record also indicates that counsel of record for at least claimant Ayako Honda, No. 19,284, was sent a copy of this letter
 
 
 [3]
 The Supreme Court thereafter dismissed the writ of certiorari in theAratani case on March 9, 1965, 380 U.S. 938, 85 S.Ct. 951, 13 L.Ed.2d 826.
 
 
 
 56
 J. SKELLY WRIGHT, Circuit Judge (dissenting):
 
 
 57
 I agree with the court that these cases command sympathetic consideration for these many thousands of Japanese-American appellants. Respectfully, I dissent from the court's conclusion that we are powerless to provide relief.
 
 
 58
 Appellants were depositors of the Yokohama Specie Bank, Ltd. when the bank's property in the United States was seized on Pearl Harbor Day and vested as enemy property under the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., 40 STAT. 411. On August 8, 1946, Congress enacted § 34 of the Trading with the Enemy Act, 60 STAT. 925, which authorized the Alien Property Custodian to pay from the vested proceeds the claims of former owners who were citizens or residents of the United States during World War II and who had not been interned or paroled as potentially dangerous alien enemies. Pursuant to § 34(b) of the Act, the Custodian fixed November 18, 1949, as the final date for filing claims against the Yokohama Bank. Appellants in Honda, No. 19,284, Kondo, No. 19,282, and Okamoto, No. 19,283, all filed timely claims. The Government refused to recognize the claims of appellants in Okamoto on the ground they were ineligible under the statute because they had been interned and paroled. This ruling was correct and disposes of that case.[1]
 
 
 59
 The claims of appellants in Honda and Kondo were recognized by the Custodian, however, to the extent that toward the end of 1958 they were sent letters as eligible claimants, instructing them to send in their original certificates of deposit or equivalent proof and informing them that if proper proof were submitted a recommendation would be made that their claims be allowed at the post-war rate of exchange, which amounted to approximately 2% of the pre-war rate. Appellants were further advised that any claim not timely submitted would be dismissed as abandoned. Appellants failed to comply with the requirements of the 1958 letter.
 
 
 60
 Around September 1961 the Custodian prepared and sent by registered mail to all claimants a Final Schedule of all Yokohama Bank depositor claims allowed and the proposed payment in each case. A Notice was included advising that "[i]f your claim is not shown on the Schedule, it is for the reason that the claim has been dismissed and disallowed by this Office"; that any claimant considering himself aggrieved "may, within sixty (60) days" file for judicial review; and that "[i]f no such complaint for review is filed within the sixty-day period, payments to claimants will be made" in accordance with the Schedule. Appellants did not file for judicial review within 60 days of the letter, as required by § 34(f) of the Act.
 
 
 61
 In Abe (pronounced "Ah-bey") v. Kennedy, a timely complaint, demanding payment at the pre-war rate, was filed in the District Court on behalf of all Yokohama Bank claimants who had complied with the Custodian's 1958 letter. Proceedings in Abe were stayed pending the outcome of Aratani v. Kennedy, which involved the same issue with depositors of a different Japanese bank.
 
 
 62
 The District Court granted the Government's motion to dismiss in Aratani, this court affirmed, 115 U.S.App.D.C. 97, 317 F.2d 161, 323 F.2d 427, and the Supreme Court granted certiorari, 375 U.S. 877, 84 S.Ct. 147, 11 L.Ed.2d 110 (1963). The Government then entered into a settlement with complainants in Aratani and Abe, which was referred to the District Court by the Supreme Court, 376 U.S. 936, 84 S.Ct. 790, 11 L.Ed.2d 657 (1964), and approved in 1964, D.D.C., 228 F.Supp. 706. The Abe settlement was for well over 60% of the amount claimed, and in fact came to approximately 100% of the original deposits without interest.[2] Appellants' petition to be included in the settlement was denied by the Government on the ground that they were not parties to the litigation being compromised. They then brought these actions. The District Court granted a Government motion to dismiss for lack of jurisdiction because the complaints were filed long after the 60-day limitation period prescribed by the Act. This appeal challenges the dismissal.
 
 
 63
 * Appellants urge us, under the circumstances of this case, to estop the Government from asserting the 60-day statute of limitations. In addition to denying that any basis for estoppel is shown, the Government advances two arguments which would bar consideration of the plea.
 
 
 64
 The Government argues first that estoppel cannot be applied against it. It may be true that estoppel does not lie against the United States where its officers or agents, without authority, enter into agreements to do what the law does not sanction or permit. E. g., Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); United States v. Stewart, 311 U.S. 60, 70, 61 S. Ct. 102, 85 L.Ed. 40 (1940). Compare Maguire & Zimet, Hobson's Choice and Similar Practices in Federal Taxation, 48 HARV.L.REV. 1281, 1299 (1935). But when the conduct relied upon as the basis for estoppel is authorized, estoppel has often been applied against the Government by a number of courts, including this one.[3] Here, admittedly, the officers who communicated with appellants and who formulated the policy which resulted in the 1958 offer and the 1963 settlement all acted within their authority.
 
 
 65
 The Government's second argument, that the 60-day limitation period for judicial review provided in the Act is "substantive" rather than "procedural" and therefore cannot be extended, is likewise unfounded. The suggestion seems to be that, since the limitation provision is included in the same Act which creates the right, the passage of time itself extinguishes the right. The Supreme Court rejected this argument in ruling that estoppel may prevent a private party from pleading the "substantive" limitation period of the Federal Employers' Liability Act. Glus v. Brooklyn Eastern Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). See also United States for Use of E. E. Black Limited v. Price-McNemar Construction Co., 9 Cir., 320 F.2d 663 (1963) (estoppel applied in favor of the Government in Miller Act case despite "substantive" statute of limitations). More recently, also in tolling the FELA limitation period, the Supreme Court said: "[T]he `substantive'-`procedural' distinction would seem to be of little help in deciding questions of extending the limitation period." Burnett v. New York Central R. Co., 380 U.S. 424, 427 n. 2, 85 S.Ct. 1050, 1054, 13 L. Ed.2d 941 (1965). "[T]he basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." Id. at 427, 85 S.Ct. at 1054. Of course, Congress can make a limitation period inflexible, but in order to do so it must do more than merely place the limitation and the right in the same statute.
 
 
 66
 In deciding that the limitation period in FELA was not inflexible the Supreme Court, in Burnett, examined "the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." 380 U.S. at 427, 85 S.Ct. at 1054. These cases meet the test of Burnett. There are no problems of notice or proof. Appellants' claims, which the Government concedes are valid, were timely filed with the Custodian before 1949. The "Act itself" is remedial and humane. It was passed at the Custodian's urgent request, in part for the benefit of the Government, and was designed to return to rightful creditors on an equitable basis, rather than according to a "first come, first served" rule, assets kept out of enemy hands.[4] Both Congress and the Custodian recognized the strong moral obligation owed to rightful creditors.[5] Certainly any application of equitable principle permissible under FELA, which is designed purely to benefit employees, is permissible here, where the Government also benefited, and where a strong moral obligation was recognized.
 
 
 67
 Moreover, there is nothing in the Act's "remedial scheme" which indicates congressional intent to limit or preclude equitable extension of the limitation period. Section 34(f) does set out the 60-day requirement, but this only poses the issue rather than answers it.[6] Neither does § 34(i), which provides that the sole relief for vested property claimants shall be that provided in the Act, indicate congressional intention to make the limitation period inflexible. This provision was designed only to prevent independent suits for recovery of property.[7] Speed in resolving all claims was a matter of importance to Congress, but only as it related to the general purpose of effectuating an equitable distribution. Thus § 34(b) ordered the Custodian to fix "bar dates" within which debt claims could be filed, no later than two years from the date of vesting or of enactment. This enabled the Custodian to determine at one time which claimants were eligible, and to distribute each account equitably. Appellants complied with this fundamental requirement.[8] The 60-day limitation with which they failed to comply can hardly be said to constitute a fundamental and inflexible part of the Act's remedial scheme.[9]
 
 
 68
 Reiterating the old aphorism — "The failure to satisfy the conditions of the sovereign's consent to be sued is fatal to the court's jurisdiction" — the Government argues, however, that equitable principles may not be used to vary the literal terms of the sovereign's consent. But neither reason nor authority is advanced to show why the approach taken in Glus and Burnett in determining whether a "substantive" limitation period is inflexible should not apply in suits against the Government. In fact, Burnett cited with approval[10] Osbourne v. United States, 2 Cir., 164 F.2d 767 (1947), which involved claims against the Government under the Suits in Admiralty Act and against a private employer under the Jones Act. The court in Osbourne tolled the "substantive" limitation periods of both statutes without discussing any possible difference between them. If equitable principles may be applied to extend the limitation period for a claim against the Government which would have to be satisfied from the federal treasury, as in Osbourne, no reason appears why such principles should not be applicable in suits against the United States where the claims are to be satisfied only from vested funds of the Yokohama Bank.
 
 II
 
 69
 The Government's opposition on the merits to the plea of estoppel is predicated on a rigid and mechanical approach to that doctrine. Estoppel is a "simple and wholly untechnical conception, perhaps the most powerful and flexible instrument to be found in any system of court jurisprudence." Statement of Sir Frederick Pollock, quoted in Canada and Dominion Sugar Co. Ltd. v. Canadian National Steamships, Ltd., [1947] A.C. 46, 55. It should be neither rigidly circumscribed nor mechanically applied.[11] This does not mean courts are free to apply estoppel indiscriminately. The fundamental requirements — a representation, reliance, change of position, detriment — must be met.[12] But once these elements are present, the novelty of a particular case should not deter courts from using the device to do justice.
 
 
 70
 The facts of this case reveal a combination of circumstances and procedures which have operated to bring about a potential injustice of substantial proportion. Appellants all filed timely claims. They could have obtained the post-war ratio for their deposits at any time at the Yokohama Bank in Japan. They did not. Rather, they held on to their certificates of deposit, hoping their own government, applying the beneficent provision of the Act, would treat them more fairly. But in 1958, after waiting 12 years to cash their deposit certificates, the Custodian informed them their recovery would be limited to the post-war ratio.
 
 
 71
 Many of the appellants undoubtedly could not understand the Custodian's technical letter. But even if we assume they could, it seems certain the letter discouraged them from filing their certificates. The ratio offered rendered their small deposits almost completely worthless. A $500 creditor suddenly found he might be entitled to $10. Moreover, the letter pointed out that "[p]ayment of your claim, however, will not be made immediately," because it remained necessary to compile a Final Schedule (which took approximately three years). The letter then advised, however, that claimants could receive the same rate in Japan without going through as much trouble: "Under the circumstances, you may wish to utilize the funds in Japan rather than await settlement by this Office."
 
 
 72
 The 1958 letter unquestionably contained an authorized representation of fact — that it was the Government's position that payment should be made at the post-war rate. This representation was relied upon by appellants when they failed to file their certificates, knowing full well they could get the same rate at any time in Japan. The Government knew reliance might follow, and encouraged such reliance by suggesting Japan as an alternate, speedier source of funds. That only 1,817 of about 7,500 eligible claimants complied with the letter is strong evidence of its effect.
 
 
 73
 It turns out, however, that the Government's position changed. When the Supreme Court granted certiorari in Aratani, the Government settled the cases on a basis completely at variance with its original position. The power of the Government to take its 1958 position, and to change its position in 1963, is incontestible. But the exercise of this power cannot become a means, whether intentional or inadvertent,[13] whereby innocent persons who acted in reliance upon the Government's first representation should be denied the opportunity to recoup moneys which Congress wanted returned. The pattern of events — the letter which discouraged filing of certificates because of the position taken therein, the failure of the vast majority of claimants to file certificates, the subsequent change of position and settlement, the exclusion of appellants from the benefits of the change of position — could hardly have been better designed to secure exclusion of most claimants from the relief Congress afforded them, and from the relief to which the Office of Alien Property now apparently agrees they were always entitled.
 
 
 74
 We have here a remedial and humane piece of legislation designed to secure the equitable return of property to American citizens. The purposes of the limitation period have been satisfied, and nothing in the Act's remedial scheme limits or precludes equitable extension of the limitation period. The Yokohama Bank account, with over $10,000,000 in cash, has more than enough to pay appellants the same rate paid the claimants in Abe. Under these circumstances, the Government should not be permitted to assert the statute of limitations as a bar to the suit. Appellants should be allowed to take advantage of the Government's new position.
 
 
 75
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Interstate Commerce Comm. v. Humboldt Steamship Co., 224 U.S. 474, 32 S.Ct. 556, 56 L.Ed. 849 (1912), is inapposite. InHumboldt, the I.C.C. "refused to proceed at all, though the law required it to do so." Id. at 485, 32 S. Ct. at 559. Here, the Custodian exercised jurisdiction over these claims and denied them on the merits. Congress acted within its power when it excluded these appellants, non-citizens at the time of seizure, from the relief the statute affords. Masami Sasaki v. Rogers, D.D. C., 185 F.Supp. 191 (1960).
 
 
 [2]
 The Government's statement implies that the settlement was for 49% of the amount claimed. Actually, 49% is the amount paid over to the claimants —i.e., the total award less 20% for attorneys' fees. Brief for Respondent, p. 7.
 
 
 [3]
 Stockstrom v. Commissioner of Internal Revenue, 88 U.S.App.D.C. 286, 190 F.2d 283, 30 A.L.R.2d 443 (1951); Vestal v. Commissioner of Internal Revenue, 80 U.S.App.D.C. 264, 152 F.2d 132 (1945). Berger, Estoppel Against the Government, 21 U.CHI.L.REV. 680, 687-688 (1954):
 "However the case may be with respect to `unauthorized' conduct, estoppel clearly may be based upon `authorized' conduct. From the Supreme Court's oft-repeated formulation of the immunity from estoppel in terms of administrative action that `the law does not sanction or permit,' it may be inferred that government is bound by actions within the scope of the agent's authority. A steadily growing number of federal courts have properly so held, for the sole tenable argument for the immunity derives from separation of powers considerations which have no play where administrative action is authorized by Congress. In such case the government should be and is estopped." (Emphasis in original.)
 In holding that estoppel cannot be applied against the Government, the majority ignores these authorities. The statement in Legerlotz v. Rogers, 105 U.S.App.D.C. 256, 258 n. 5, 266 F.2d 457, 459 n. 5 (1959), relied on by the majority, that estoppel does not lie against the Government, is dictum and arose in a context which clearly precluded application of the doctrine. The Attorney General had sent plaintiff a Notice of Intention to return a certain sum seized during the war, but later decided to retain a part of the sum involved. Plaintiff, allegedly in reliance upon the Notice, failed to bring suit within the two years prescribed by statute. But the court pointed out that the statute specifically provided that a Notice of Intention conferred no right of action to compel the return of property; the provision's purpose was to leave the Attorney General with the power freely to change his mind.
 
 
 [4]
 The Supreme Court held, in Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), that creditors or allies of enemies whose property had been seized by the Custodian during World War II may maintain suits against the Custodian on their debt claims under the Trading with the Enemy Act § 9(a), although that section appeared to apply only to World War I seizures. This resulted in a "first come, first served" rule — a race of creditors which exhausted properties without equitable distribution — and in serious interference with the use of the property to the best interests of the United States. Congress acted promptly. Within one year, § 34 was passed at the Custodian's urgent recommendation, providing for the equitable distribution of vested property by disallowing independent suits and by setting up a procedure whereby all claims could be considered and disposed of together. H.R.Rep. No. 2398, 79th Cong., 2d Sess. (1946)
 
 
 [5]
 "The Custodian has emphasized to the committee that he is anxious to satisfy the proper claims of creditors and the committee concur in the view that there exists a strong moral obligation to satisfy them inasmuch as, but for the vesting of their debtors' property, they would presumably have been able to pursue ordinary remedies against the debtors." H.R.Rep. No. 2398,supra Note 4, at p. 10.
 
 
 [6]
 The FELA provision, 45 U.S.C. § 56, if anything, is more absolute: "No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued."
 
 
 [7]
 As pointed outsupra, Note 4, passage of the present § 34 of the Act was generated by the Supreme Court ruling that creditors could sue, necessarily on a "first come, first served" basis, under § 9(a). The committee report makes clear that § 34(i) was passed to preclude § 9(a) suits:
 "Section 35(i) [now 34(i)] is generally procedural in nature. It provides that the debt claim provisions of the bill shall constitute the sole relief of creditors, except for their right to sue the original debtor or any other person liable. It is expressly provided that debt claim suits heretofore filed under section 9(a) shall not be continued and only suits to review the Custodian's determination under the bill are maintainable with respect to debt claims. This is believed necessary to the effective operation of the debt claim provisions of the bill. * * *" H.R.Rep. No. 2398, supra Note 4, at p. 15.
 
 
 [8]
 It is upon non-compliance with the similarly fundamental requirement of § 33 of the Act that the cases cited by the Government are based. See,e.g., Brownell v. Morizo Nakashima, 9 Cir., 243 F.2d 787, cert. denied, 355 U.S. 872, 78 S.Ct. 117, 2 L.Ed.2d 77 (1947).
 
 
 [9]
 The suppletive nature of the requirement makes it analogous to the 60-day reporting requirement in N. V. Philips' Gloeilampenfabrieken v. Atomic Energy Comm., 114 U.S.App.D.C. 400, 316 F.2d 401 (1963). There, petitioners owned certain foreign patents which were divulged to the United States Government in connection with Project Manhattan and were widely used. The Patent Compensation Board rejected petitioners' claim for "just compensation" on the ground that petitioners had failed to file a report describing the processes of their inventions within 60 days of the passage of the statute conferring a right to compensation. We looked to the purpose of the requirement and found, not a mechanical reporting process, but a means for assuring disclosure. It was conceded that the A.E.C. had the relevant information. We concluded: "Under the circumstances of this case, the Commission should not be allowed to seize upon this technicality to avoid a responsibility which the Congress recognized." 114 U.S.App.D.C. at 408, 316 F.2d at 409. Since in these cases the Custodian knew of appellants' claims and could include them in his computations in equitably distributing the Yokohama property, the failure to file for review in time did not interfere with the basic purpose of the Act
 
 
 [10]
 380 U.S. at 427, 85 S.Ct. 1050, 13 L. Ed.2d 941
 
 
 [11]
 Courts have refused to follow rigid definitions of the doctrine. See generally Berger,op.cit.supra Note 3; Dawson, Estoppel and Statutes of Limitation, 34 MICH.L.REV. 1 (1935); Lynn & Gerson, Quasi-Estoppel Applied Against the United States in Federal Tax Controversies, 19 TAX L.REV. 487 (1964).
 
 
 [12]
 See 3 POMEROY, EQUITY JURISPRUDENCE § 805 (5th ed. 1941)
 
 
 [13]
 See Peters v. St. Paul Fire & Marine Insurance Company, S.D.N.Y., 213 F. Supp. 441, 442 (1963):
 "Where one party induces another to delay in bringing suit so that an applicable period of limitation expires, he may be estopped from asserting such expiration in defense even though the inducement to delay was done innocently or unintentionally. * * *"
 See also Romano v. Metropolitan Life Ins. Co., 271 N.Y. 288, 2 N.E.2d 661, 105 A.L.R. 989 (1936).