749 F.2d 826
 21 ERC 2057, 242 U.S.App.D.C. 148, 15
Envtl. L. Rep. 20,005
 AMERICAN METHYL CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Motor Vehicle Manufacturers Association of the United
States, Inc., Automobile Importers of America,
Inc., United America Fuels, Inc., Intervenors.
AMERICAN METHYL CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Automobile Importers of America, Inc., Motor Vehicle
Manufacturers Association of the United States,
Inc., United American Fuels, Inc., Intervenors.
 Nos. 84-1204, 84-1277.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 29 Oct. 1984.
Decided 4 Dec. 1984.
 James W. Moorman, Washington, D.C., with whom Arnold B. Podgorsky and Scott N. Stone, Washington, D.C., were on the brief, for petitioner.
 David E. Dearing, Atty., Dept. of Justice, Washington, D.C., with whom Margaret N. Strand, Atty., Dept. of Justice, A. James Barnes, General Counsel, Ralph J. Colleli, Jr. and Gerald K. Gleason, Attys., E.P.A., Washington, D.C., were on the brief, for respondent.
 Charles H. Lockwood, II, Detroit, Mich., with whom William H. Crabtree, V. Mark Slywynsky, William L. Weber, Jr. and Thomas L. Arnett, Detroit, Mich., were on the brief of intervenors, Motor Vehicle Manufacturers Association of the United States, et al.
 R. Sarah Compton, Washington, D.C., was on the brief of intervenor, United American Fuels, Inc.
 Before WILKEY, WALD and SCALIA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILKEY.
 WILKEY, Circuit Judge:
 
 
 1
 In this expedited appeal petitioner American Methyl Corporation challenges the Environmental Protection Agency's determination that it may reconsider, and if necessary revoke, American Methyl's waiver to market a methanol/gasoline fuel blend sold as "Petrocoal."[1] We find that judicial review is appropriate at this time and reverse the agency's decision that it may revoke waivers under section 211(f) of the Clean Air Act.[2] The Administrator of the EPA is not disabled from regulating Petrocoal, but he may control or prohibit the fuel only through a proceeding complying with the substantive and procedural safeguards of section 211(c) of the Clean Air Act.[3] We remand to the agency for further proceedings in accordance with our judgment and mandate issued 31 October 1984, 746 F.2d 907.
 
 I. FACTS
 
 2
 In 1980 American Methyl developed an additive to be used in a methanol/gasoline blend it called Petrocoal.[4] Because methanol costs about forty cents per gallon, Petrocoal costs less than conventional gasoline. The relative inexpensiveness of Petrocoal and other alcohol/gasoline blends--to say nothing of the fact that they may be produced domestically, thereby reducing America's reliance on foreign sources of petroleum--makes them attractive substitutes for gasoline.[5]
 
 
 3
 To market the Petrocoal additive, American Methyl sought a waiver from the Administrator of the Environmental Protection Agency. Under section 211(f)(1) of the Clean Air Act,[6] it is
 
 
 4
 unlawful for any manufacturer of any fuel or fuel additive to first introduce into commerce, or to increase the concentration in use, of, any fuel or fuel additive for general use in light duty motor vehicles ... which is not substantially similar to any fuel or fuel additive utilized in the certification of any ... [1975 or later model year vehicle or engine].[7]
 
 
 5
 The impetus for this section was the fear that new fuel and new fuel additives, particularly an organomanganese compound known as MMT, would impair the performance of emission control devices in cars and light duty trucks.[8] As Senator Muskie, chief sponsor of the Senate bill, put it: "This action was absolutely essential ... [given] the alarming degrees to which MMT, and potentially hundreds of other additives, threaten our entire air pollution control program."[9] The Administrator of the EPA may waive the section 211(f)(1) prohibition if the manufacturer establishes that the fuel or additive "will not cause or contribute to a failure of any emission control device or system ... to achieve compliance by the vehicle" with applicable emissions standards.[10]
 
 
 6
 American Methyl applied for a waiver on 20 February 1981,[11] which the Administrator granted on 28 September of that year.[12] American Methyl's expenditures in developing and marketing Petrocoal totalled nearly one million dollars.[13]
 
 
 7
 Just over two months later, on 4 December 1981, a trade association of automobile manufacturers known as the Motor Vehicle Manufacturers Association filed a petition for administrative reconsideration of the Petrocoal waiver with EPA[14] and another petition for review of the waiver in this court.[15] Despite questions relating to the high alcohol content and ratio of methanol to cosolvents in Petrocoal, and the possible presence of a corrosive additive, CV-100, in certain test samples,[16] the EPA did not act on MVMA's petition.[17]
 
 
 8
 Over a year later, on 22 February 1983, MVMA filed a supplemental petition for reconsideration accompanied by new data purporting to show that Petrocoal caused automobiles to exceed limits for evaporative emissions of hydrocarbons.[18]
 
 
 9
 Prompted by the recently compiled data in MVMA's supplemental petition, the Administrator on 2 May 1983 published a notice in the Federal Register that he was "considering whether an administrative action is appropriat [sic] to modify or revoke the waiver under section 211(f) or to control or prohibit sale of Petrocoal under section 211(c), or whether the waiver should stand as granted."[19] Section 211(c), in contrast to section 211(f), imposes a number of substantive and procedural requirements the agency must satisfy before controlling or prohibiting a fuel or fuel additive.[20] The Administrator's notice elicited no response from American Methyl.
 
 
 10
 Close to another year passed before the Administrator, on 16 March 1984, proposed to revoke the Petrocoal waiver; the decision was published in the Federal Register on 28 March 1984--nearly two-and-a-half years after the Petrocoal waiver was initially approved.[21] A principal basis of the Administrator's decision was the new study reported by MVMA which claimed that Petrocoal caused automobiles to exceed limits on evaporative emissions of hydrocarbons.[22] The notice stated that "[i]n reconsidering the Petrocoal waiver, the standard for review of the newly submitted and developed information is that prescribed in section 211(f)(4) of the Act."[23]
 
 
 11
 Almost at the same time, on 27 March 1984, the parties to the appeals from approval of the original waiver in 1981 jointly moved to remand the record to EPA, so that the agency could take further administrative action with respect to the waiver.[24] On 3 April this court granted the motion.[25]
 
 
 12
 One month later, however, on 3 May 1984, American Methyl formally requested the Administrator to rescind his proposal to revoke the Petrocoal waiver, on the ground that section 211(f) does not permit him to reconsider or revoke a waiver.[26] In a letter dated 8 June 1984, the EPA General Counsel denied American Methyl's request and asserted the agency's inherent authority to revoke a waiver pursuant to section 211(f).[27] He also explained that under section 211(f)(4) American Methyl would have to justify the validity of the Petrocoal waiver ab initio:
 
 
 13
 Finally, with regard to your question as to which party has the burden of proof in these proceedings, the March 28, 1984, Federal Register notice clearly states that the standard of review to be used in the reconsideration proceeding will be the same as that used in evaluating waiver applications under section 211(f)(4). 49 Fed.Reg. 11885. Accordingly, the burden of establishing that Petrocoal meets the criteria for a valid waiver specified in section 211(f)(4), taking into account all available information, should be borne by American Methyl.[28]
 
 
 14
 The General Counsel confirmed, in a letter dated 22 June 1984, that "in keeping with my responsibilities as General Counsel" the 8 June letter "expressed the Agency's official position on these legal matters."[29]
 
 
 15
 American Methyl filed a petition for review of EPA's notice of proposed revocation on 25 May 1984, and of the 8 June letter on 2 July 1984.[30] American Methyl claimed that its sales, which had been at a record high level before EPA threatened to revoke the Petrocoal waiver under section 211(f), had virtually ceased in a matter of months.[31]
 
 
 16
 On 13 July, American Methyl moved this court to stay a hearing on EPA's proposal to revoke the Petrocoal waiver, which had been scheduled for 31 July.[32] EPA opposed the motion and on 20 July moved to dismiss both petitions for review. A motions panel composed of two other judges of this court, by order dated 27 July, granted American Methyl's motions to consolidate and to stay EPA's proposed revocation proceeding and denied the agency's motion to dismiss.[33]
 
 
 17
 This appeal presents the following three issues: first, is judicial review appropriate at this stage in the administrative process; second, should American Methyl be estopped from challenging EPA's assertion of revocation authority; and third, does section 211(f) of the Clean Air Act empower EPA to revoke the Petrocoal waiver?
 
 
 18
 We find judicial review appropriate at this time and decline to estop American Methyl from challenging the agency's interpretation of its statutory powers. We hold that the Administrator may not revoke the Petrocoal waiver pursuant to section 211(f), but may forbid the marketing of Petrocoal only pursuant to his authority to control or prohibit fuel and fuel additives under section 211(c).
 
 II. ANALYSIS
 
 19
 At stake in this procedural battle is the applicability of certain substantive and procedural safeguards to a proceeding in which the Environmental Protection Agency proposes to revoke American Methyl's waiver to market Petrocoal. Under American Methyl's interpretation of the Clean Air Act, EPA is authorized to control or prohibit the marketing of Petrocoal only under section 211(c); that section requires EPA to follow specific substantive and procedural guidelines. In contrast, EPA interprets section 211(f), under which the Petrocoal waiver was originally granted, to authorize revocation of the Petrocoal waiver irrespective of the guidelines specified in section 211(c); section 211(f), which does not admit the existence of a revocation procedure, not surprisingly fails to regulate the conduct of such proceedings. If section 211(f) is construed as EPA would have it, no particular substantive or procedural requirements (apart from whatever procedural minima may be required by the Constitution's due process clause[34]) need be followed.
 
 A. Timing of Judicial Review
 
 20
 EPA contends that review of the agency's purported authority to revoke waivers is premature, on the grounds that the agency's decision lacks finality and is not ripe for review and that American Methyl has failed to exhaust its administrative remedies. These points formed the basis of a motion to dismiss by EPA, which was considered and rejected by a motions panel of this court last July. There is no theoretical obstacle to our reconsidering the motions panel decision,[35] which, as is usual, was rendered without oral argument and (since it was not dispositive of the appeal) with the participation of only two judges. Moreover, not all of the present panel agree with the motions panel's disposition. However, given the circumstance that this agency proceeding has already been delayed several times by judicial action, and that the motions panel action has extended the present delay still further; and given what seems to us the clarity of the merits of the matter, which will ultimately require the agency's action to be set aside if the present challenge is dismissed; we are not inclined to revisit the issues of finality, ripeness, and exhaustion, and without further consideration accept the motions panel's determination as the law of this case.[36]
 
 B. Equitable Estoppel
 
 21
 Besides the asserted prematurity of judicial review, EPA also claims that American Methyl should be estopped from challenging its authority to revoke the Petrocoal waiver.[37] According to the Administrator, equitable estoppel is warranted for two reasons. First, American Methyl waited over a year to challenge EPA's revocation authority, which the agency first broached in its 2 May 1983 Federal Register notice[38] and to which American Methyl did not object until 20 April 1984.[39] Second, EPA points out that American Methyl joined with other parties to the 1981 appeals in a motion to remand to the agency the record compiled in the original waiver proceeding.[40]
 
 
 22
 In our view, American Methyl had no obligation to object until EPA made clear that it would proceed under section 211(f). Although the agency's 2 May Federal Register notice mentioned revocation of the Petrocoal waiver under section 211(f) as one of three possibilities,[41] we do not think American Methyl was required to object immediately to each item on the agency's laundry-list of tentative options, even if that list is a short one, or forever hold its peace. The contrary holding would encourage appeals every time an agency announced that it was contemplating some arguably objectionable action.
 
 
 23
 EPA did not elect to proceed under section 211(f) until 16 March 1984, in a Federal Register notice published on 28 March.[42] This notice led to the 3 April remand in which American Methyl acquiesced. That acquiescence was a mistake, but American Methyl objected to the agency less than a month later.[43] Any detriment attributable to that brief delay is de minimis considering the lengthy delays associated with this case.[44]
 
 C. Scope of Judicial Review
 
 24
 Section 307(d)(9) of the Clean Air Act authorizes this court to "reverse any ... action [of the Administrator] found to be ... (C) in excess of statutory ... authority, or limitations, or short of statutory right."[45] In exercising this power, the Supreme Court has recently admonished us, in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,[46] to give "considerable weight" to the "executive department's construction of a statutory scheme it is entrusted to administer."[47] Although "courts are the final authorities on issues of statutory construction,"[48] "[i]f ... the court determines [that] Congress has not directly addressed the precise question at issue, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute."[49]
 
 
 25
 Notwithstanding the great deference accorded an agency's interpretation, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."[50] In this case, the legislative history is inconsistent with the standardless and open-ended authority to revoke waivers--to be asserted in this case nearly two-and-one-half years after the waiver was granted and based entirely on new evidence--which is sought by EPA.
 
 
 26
 D. The Environmental Protection Agency's Assertion of Inherent Revocation Authority
 
 
 27
 Section 211(f) does not state whether waivers granted under subsection (f)(4) may be reconsidered and revoked. According to the legislative history, however, Congress contemplated regulation of fuels and fuel additives so waived into commerce only through proceedings under section 211(c); the legislative understanding thus rejects the implied revocation authority claimed by the EPA. Moreover, the interrelationship of subsections (f) and (c)--with subsection (f) regulating the "first" introduction of fuels and fuel additives into commerce and subsection (c) governing the control or prohibition of fuels and fuel additives already in commerce--gives effect to the requirements of each subsection and comports with Congress's understanding of their interdependence. Finally, our recognition of authority under section 211(c) to regulate fuels and fuel additives in commerce, to the exclusion of an implied revocation authority under section 211(f), is consistent with past administrative practice and effectuates the objectives of the Clean Air Act.[51]
 
 1. The understanding of Congress
 
 28
 A revealing paragraph in the committee report on the Senate bill suggests that the EPA administrator, once having waived a new fuel or fuel additive into commerce under section 211(f)(4), may not "revoke" a waiver under that same section:
 
 
 29
 The committee was mindful that the Administrator could choose not to act on the waiver application within the 180 days provided for such action. If the Administrator does fail to act under subsection (d) [now subsection (f) ] to either grant, conditionally grant, or deny the waiver, it does not diminish the Administrator's power to act against the fuel or fuel additive through the application of the provisions of subsection (c) of this section.[52]
 
 
 30
 Congress, according to this passage, understood that waivers granted by default could not be revoked; rather, the Administrator must initiate appropriate proceedings pursuant to section 211(c) if he wants to control or prohibit a fuel or fuel additive waived into commerce.
 
 
 31
 EPA agrees with this reading of the quoted paragraph, but believes its logic is limited to waivers granted automatically after 180 days:
 
 
 32
 There is absolutely no indication that the committee gave any thought to what remedies EPA might pursue if it appeared that its affirmative decision that the applicant had satisfied section 211(f)(4) had been based on serious factual mistakes. In contrast, waivers granted under the 180-day provision do not involve any affirmative decision that could be called into question or reconsidered later.[53]
 
 
 33
 EPA's reading of the Senate Report, however, would have the perverse and presumably unintended effect of according the greatest deference to the least thought-out waivers. To permit revocation only of waivers granted after due consideration would inexplicably insulate from reconsideration waivers granted by operation of law and without any thought on the agency's part. Waivers granted after the statutorily-prescribed determination that the fuel or fuel additive "will not cause or contribute to a failure of any emission control device or system ... to achieve compliance ... with emission standards"[54] would be open to revocation at any time, based on any evidence, subject to no substantive or procedural safeguards. We cannot believe that Congress would countenance such an ill-conceived revisory power.
 
 
 34
 We have held that agencies have an inherent power to correct their mistakes by reconsidering their decisions within the period available for taking an appeal.[55] That period has long expired here. We need not consider what further inherent or implicit authority might exist in the abstract, since, in the present case, Congress has provided a mechanism for correcting error by authorizing under section 211(c) control or prohibition of fuels and fuel additives mistakenly waived into commerce under section 211(f).
 
 
 35
 Thus, when Congress has provided a mechanism capable of rectifying mistaken actions, in this case by authorizing under section 211(c) control or prohibition of fuels and fuel additives mistakenly waived into commerce under section 211(f), it is not reasonable to infer authority to reconsider agency action. This " 'common sense' "[56] observation recalls the maxim frequently invoked by the Supreme Court in construing statutes:[57] expressio unius est exclusio alterius, that is, "mention of one thing implies exclusion of another thing."[58] As the Supreme Court stated in National Railroad Passenger Corporation v. National Association of Railroad Passengers (Amtrak),[59] " '[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' "[60] Thus, while Congress may have wanted the Administrator to correct his mistakes, it provided a mechanism sufficient to this task in section 211(c). It further understood this mechanism as the exclusive means by which he was to correct waivers mistakenly granted by default. We therefore see no need to imply authority under section 211(f) to reconsider waivers granted after due deliberation. What suffices to correct waivers mistakenly granted by default should also suffice to correct the (hopefully) far smaller proportion of waivers mistakenly granted after careful consideration.
 
 2. Consistency with the statutory design
 
 36
 The absence of implied revocation authority suggests a straightforward relationship between sections 211(c) and 211(f) which is consistent with the text of the statute and its apparent design:[61] section 211(f) forbids the "first" introduction of new fuels and new fuel additives into commerce; section 211(c) provides for regulation of fuels already in commerce.
 
 
 37
 Section 211(f)(1) on its face governs every "fuel or fuel additive ... first introduce[d] into commerce" or whose concentration in any fuel or fuel additive is increased.[62] Waivers of this prohibition under section 211(f)(4) are required only of these same fuels and fuel additives.
 
 
 38
 By way of comparison, section 211(c) authorizes the Administrator to "control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive" in order to reduce harmful air pollution and to maintain the performance of emission control equipment.[63] Construing section 211(f) not to authorize revocation of waivers thus leaves no lacuna in the statute: The Administrator is empowered to take action against an offending fuel or fuel additive under section 211(c) if it impairs the performance of pollution control equipment, which is precisely the evil an implied revocation authority would remedy.
 
 
 39
 Furthermore, our unwillingness to imply revocation authority under section 211(f) is consistent with subsection (f)(4)'s requirement that the Administrator act on a waiver application within 180 days or be deemed to have granted the same.[64] The implication of a standardless revocation authority, exercisable over an indefinite term, would in effect empower the Administrator to deny a waiver after the 180-day period had elapsed, thereby writing the 180-day time limit out of the statute. This revocation power would be exercised, moreover, without regard for the substantive and procedural safeguards afforded by section 211(c)--safeguards which the EPA concedes are applicable to fuels waived into commerce by default by virtue of the paragraph in the Senate Committee Report quoted above.[65] The text and design of section 211 thus support our conclusion that Congress did not authorize the EPA Administrator to revoke waivers granted under section 211(f).
 
 
 40
 3. Admissions and Administrative Practice of the EPA
 
 
 41
 Our unwillingness to wrest a standardless and openended revocation authority from a silent statute is strengthened by examination of EPA's own commitment to revocation authority--a commitment that has been qualified and tepid at best.
 
 
 42
 a. Admissions before this Court
 
 
 43
 In its brief and at oral argument, EPA conceded that a "correct" initial waiver could not be revoked and that any subsequent action against the fuel or fuel additive must perforce be taken in a proceeding under section 211(c).[66] By "correct," EPA apparently means that the initial waiver must have been warranted by the record compiled at the time the waiver was granted; only if "the original waiver decision was fundamentally wrong because the record, upon re-examination, actually did not support the necessary showings" may the waiver be revoked.[67]
 
 
 44
 Because there is no issue now before us as to the original administrative record justifying the Petrocoal waiver, however, revocation is unwarranted on the agency's own view of the statute. In its notice of proposed revocation, EPA advanced three reasons for reconsidering the Petrocoal waiver. Two of the reasons appear to be make-weights by EPA's own admission; the third is based on new evidence and reflects no deficiency in the agency's original determination. Since this last reason seemingly prompted the Administrator's second thoughts about Petrocoal, we consider it first.
 
 
 45
 The chronology of events,[68] EPA's notice soliciting comments on whether to reconsider the Petrocoal waiver,[69] and the agency's notice of proposed revocation,[70] all show that EPA's principal concern is that cars using Petrocoal will exceed the limits imposed on evaporative emissions of hydrocarbons. Whatever the validity of this concern, it in no way impugns the validity of the original waiver--the Administrator's concern is based, as he put it, on "new data."[71] As he stated in his Federal Register notice proposing revocation: "Based on information submitted in response to the May 2, 1983 Federal Register notice, and other information provided to the Agency since the grant of Petrocoal waiver, the Agency is today proposing to revoke that waiver."[72] The Administrator's answer to American Methyl's argument that expiration of the sixty-day period for judicial review precludes reconsideration, leaves no issue before us as to the adequacy of the original waiver. In a footnote, the Administrator pointed out that the sixty-day time limit was inapplicable because the information on evaporative emissions became available after the period had expired:Moreover, regardless of the merits of American Methyl's argument with respect to MVMA's original petition for reconsideration, the petition as supplemented and the comments in response to the May 2, 1983 Federal Register notice clearly present new information not available to the Agency during the comment period....[73]
 
 
 46
 EPA's primary reason for revoking American Methyl's waiver does not relate to a defect in the original grant; thus, under EPA's own interpretation of its powers, a revocation proceeding is not warranted in this case.[74]
 
 
 47
 EPA's remaining two reasons for reconsidering the Petrocoal waiver, although they relate to the original waiver grant, are red herrings. In six trim paragraphs of his eight-page, triple-columned, single-spaced notice of proposed revocation, the Administrator now finds that he had no basis for approving the particular alcohol blend used in Petrocoal when he approved the waiver in 1981.[75] Intervenors Motor Vehicle Manufacturers Association raised precisely this contention in their petition for administrative reconsideration filed on 4 December 1981,[76] yet EPA took no action until presented with new data on evaporative emissions a year-and-a-half later. Tellingly, if the Administrator was concerned about the high alcohol content of Petrocoal, one would hardly expect him to dismiss out of hand American Methyl's offer to reduce the percentage of alcohol.[77]
 
 
 48
 In the pages of the Federal Register the Administrator also professes concern over whether some test samples of Petrocoal contained the metallic additive CV-100.[78] The presence of the additive in test samples but not in the fuel actually marketed could mean that Petrocoal at the pump fails to perform like the Petrocoal submitted for testing and approved by EPA. Yet in a letter denying American Methyl a hearing on this question, the agency declared that "the issue itself is not significant enough to warrant imposition of full trial-type hearing procedures" and adopted the analysis in American Methyl's "memorandum of April 27," which recognized that "the presence of CV-100 is at best an ancillary matter, unlikely to influence EPA's final decision."[79]
 
 
 49
 Because the Administrator points to no defects in his original approval of the Petrocoal waiver, he may not--according to his own interpretation of section 211(f)--reopen that waiver. He may proceed to regulate Petrocoal, if he thinks it necessary, under the powers conferred upon him by section 211(c).
 
 
 50
 b. Prior administrative practice
 
 
 51
 Independent of EPA's admissions before this court, the agency's prelitigation administrative practice belies its professed belief in an implied revocation authority. In seven years of administering section 211(f), American Methyl is the first manufacturer subjected to a revocation proceeding.[80] In a prior case, when assertion of such authority would have been appropriate, the Administrator made no mention of it and instead relied on his power under section 211(c), a course of conduct exemplifying the understanding of section 211 we adopt today.
 
 
 52
 A brief recitation of a proceeding involving the Sun Petroleum Products Company exposes the novelty of EPA's construction of section 211. The Administrator conditioned the grant of Sun Petroleum's waiver on disclosure of a proprietary additive's chemical composition; he reserved the right to "revoke the waiver if, after receiving a petition for reconsideration, he determines that based on new data and information not available prior to the public disclosure of the proprietary additive's chemical composition, the applicant is not entitled to the waiver."[81]
 
 
 53
 General Motors subsequently filed a petition for reconsideration in the Sun Petroleum proceeding. Because the initial waiver provided for reconsideration, the Administrator applied the same standard of review that he applied to Sun Petroleum's initial application.[82] The Administrator denied General Motor's petition and thereby removed the revocation contingency in Sun Petroleum's waiver. Revealingly, in describing his remaining authority under the Clean Air Act, the Administrator said:
 
 
 54
 This [waiver] does not preclude GM or others from continuing to research this question and developing sufficient date [sic] to support a future rulemaking in this area. I retain the authority under Section 211(c) of the Act to control or prohibit this blend or other alcohol/gasoline blends if new data are presented to warrant such action.[83]
 
 
 55
 Taking EPA's past administrative practice as implementing the proper reading of section 211, the agency is without authority to revoke a noncontingent waiver, based on new evidence, nearly two-and-one-half years after its initial approval.[84] Combined with Congress's understanding of section 211 and the consistency of that understanding with the statutory design, the Sun Petroleum precedent constitutes a tacit admission that section 211(f) does not impliedly authorize the reconsideration of waivers in these circumstances.[85]
 
 4. Objectives of the Clean Air Act
 
 56
 Our inquiry ends upon ascertaining that the Administrator's reading of his authority under section 211(f) is contrary to what Congress intended;[86] we note, however, that our interpretation furthers both procedural certainty as well as the public's need for protection from harmful air pollution.
 
 
 57
 By upholding Congress's disinclination to grant EPA an unguided and open-ended power to revoke waivers, we ensure that entities subject to regulation under section 211 know what is expected of them. Protecting the legitimate expectations of fuel manufacturers comports with basic fairness; it also encourages investment in technology to create more efficient, less costly, and less polluting substitutes for conventional fuels.
 
 
 58
 Like the sword suspended by a hair above the courtier Damocles, the Administrator's claimed revocation authority would pose an ever-present threat to the marketing of new fuels, fostering great uncertainty in the business community. Technologically-advanced fuels could be taken off the market at any time, and neither specified hearing procedures nor rules of repose would cabin the Administrator's discretion. This risk is hardly typical of commercial operations in a regulated economy. Moreover, because the manufacturer's product is assumed undeserving of waiver, the presumption is against the continued existence of his business even if his waiver is challenged with evidence gathered years after heavy capital investment--an extraordinary risk for a commercial entity to bear, as agency counsel conceded at oral argument.
 
 
 59
 Because a manufacturer could never know ex ante whether his product would be available for sale for a sufficient time to recoup his initial investment, he might well decide not to risk his capital in the first place. As a consequence, the public and this nation would suffer from lack of innovation in fuels and fuel additives, to the ultimate detriment of air quality and our national security.[87]
 
 
 60
 Besides providing procedural certainty, our opinion should also promote more accurate agency decisionmaking in the first instance. Under EPA's reading of the waiver provision, the agency may permit a waiver to be granted by default after the passage of 180 days and revoke it later if some problem is brought to its attention. Under our reading of section 211(f)(4), however, the agency is motivated to consider a waiver request promptly and thoroughly because it cannot rely on the expedient of a post-grant revocation. The Administrator must do his job well and fast--if he makes a mistake, he must act against the fuel or fuel additive under section 211(c), with its admittedly more cumbersome but congressionally-mandated "procedural safegurads."[88] Our refusal to imply a power to revoke waivers parallels Congress's insistence that EPA make a careful, albeit expeditious, decision in the first instance; subsequent proceedings based on new evidence, when substantial investments are at stake, understandably are subject to the more exacting substantive and procedural safeguards contained in section 211(c).
 
 III. CONCLUSION
 
 61
 Finding an implied power to revoke waivers under section 211(f) of the Clean Air Act contrary to the intention of Congress and the design of that statute, we set aside the Administrator's notice proposing to revoke the Petrocoal waiver and his notice announcing a public hearing thereon, and reverse the EPA General Counsel's refusal to terminate the waiver proceeding brought pursuant to section 211(f). We remand this case for further proceedings under section 211(c), if the Administrator deems them desirable, in accordance with our judgment and mandate issued 31 October 1984.
 
 
 62
 So Ordered.
 
 
 
 [1]
 Other parties to this appeal include United American Fuels, Inc., intervening on the side of American Methyl, and Motor Vehicle Manufacturers Association, intervening on the side of EPA
 
 
 [2]
 Clean Air Act Sec. 211(f), 42 U.S.C. Sec. 7545(f) (1982)
 
 
 [3]
 Id. Sec. 211(c), 42 U.S.C. Sec. 7545(c)
 
 
 [4]
 Until 30 June 1982, American Methyl was incorporated under the name Anafuel Unlimited. For the sake of clarity, we refer to the corporation by its current name
 
 
 [5]
 Affidavit of Ronald Eames, Appendix I at 84, 85 [hereinafter cited as App.]
 
 
 [6]
 Clean Air Act Sec. 211(f), 42 U.S.C. Sec. 7545(f) (1982)
 
 
 [7]
 Id. Sec. 211(f)(1), 42 U.S.C. Sec. 7545(f)(1)
 
 
 [8]
 See H.R.REP. NO. 294, 95th Cong., 1st Sess. 308, reprinted in 1977 U.S.CODE CONG. & AD.NEWS 1077, 1387; S.REP. NO. 127, 95th Cong., 1st Sess. 90 (1977), reprinted in 3 CONGRESSIONAL RESEARCH SERV., A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977, at 1371, 1464 (Comm.Print 1978) [hereinafter cited as LEGISLATIVE HISTORY]
 
 
 [9]
 123 CONG.REC. 18,034 (1977) (statement of Sen. Muskie), reprinted in 3 LEGISLATIVE HISTORY, supra note 8, at 759
 
 
 [10]
 Clean Air Act Sec. 211(f)(4), 42 U.S.C. Sec. 7545(f)(4) (1982)
 
 
 [11]
 See 46 Fed.Reg. 21,695 (1981) (notice of application for Petrocoal waiver)
 
 
 [12]
 See id. at 48,975 (1981) (notice of grant of Petrocoal waiver). The waiver provides that the percentage of total alcohol in Petrocoal cannot exceed fifteen percent, that the ratio of methanol to cosolvents (other alcohols) cannot exceed 6.5 to 1, that the finished fuel must meet the standards of the American Society for Testing and Materials, and that Petrocoal must comply with EPA regulations applicable to unleaded gasoline. See id. at 48,976
 
 
 [13]
 See Affidavit of Ronald Eames, App. I at 84, 86
 
 
 [14]
 See App. II at 30 (excerpts from Motor Vehicle Manufacturers Association's petition for reconsideration of Petrocoal waiver)
 
 
 [15]
 See Motor Vehicle Mfrs. Ass'n v. Environmental Protection Agency, Nos. 81-2276 & 81-2279 (D.C.Cir. filed 4 Dec. 1981) (petition for review). General Motors Corporation also filed a petition for review
 
 
 [16]
 See App. II at 30, 35
 
 
 [17]
 EPA conceded the validity of the first two objections later in the litigation. See Brief for Respondent at 15, Motor Vehicle Mfrs. Ass'n v. Environmental Protection Agency, Nos. 81-2276 & 81-2279 (D.C.Cir. remanded to agency 3 Apr.1984)
 
 
 [18]
 See App. II at 38, 42-47 (excerpts from Motor Vehicle Manufacturers Association's supplemental petition for reconsideration of Petrocoal waiver)
 
 
 [19]
 48 Fed.Reg. 19,779, 19,780 (1983) (request for comments on petition for reconsideration of Petrocoal waiver)
 
 
 [20]
 See Clean Air Act Sec. 211(c), 42 U.S.C. Sec. 7545(c) (1982). Before the Administrator may "control or prohibit" a fuel or fuel additive under Sec. 211(c), he must among other things (1) consider all pertinent scientific, medical, or economic data; (2) prepare a cost/benefit analysis (for regulation protecting emission controls); (3) formally declare that the fuel or fuel additive causes or contributes to harmful air pollution or would significantly impair the effective functioning of emission control systems; and (4) formally declare that regulation would not result in use of more dangerous additives. See id
 
 
 [21]
 See 49 Fed.Reg. 11,879, 11,885 (1984) (notice of reconsideration and proposed revocation of Petrocoal waiver)
 
 
 [22]
 See id. at 11,880-81
 
 
 [23]
 See id. at 11,885
 
 
 [24]
 See Joint Motion for Remand of the Record, Motor Vehicle Mfrs. Ass'n v. Environmental Protection Agency, Nos. 81-2276 & 81-2279 (D.C.Cir. remanded to agency 3 Apr.1984)
 
 
 [25]
 See Motor Vehicle Mfrs. Ass'n v. Environmental Protection Agency, Nos. 81-2276 & 81-2279 (D.C.Cir. 3 Apr.1984) (order granting joint motion to remand)
 
 
 [26]
 See App. I at 31, 32
 
 
 [27]
 See id. at 63, 63-66
 
 
 [28]
 Id. at 69 (footnote omitted)
 
 
 [29]
 See id. at 75, 75 n. 1
 
 
 [30]
 See American Methyl Corp. v. Environmental Protection Agency, No. 84-1277 (D.C.Cir. filed 2 July 1984); American Methyl Corp. v. Environmental Protection Agency, No. 84-1204 (D.C.Cir. filed 25 May 1984)
 
 
 [31]
 See Affidavit of Ronald Eames, App. I at 84, 87-89. Mr. Eames, Chief Executive Officer of American Methyl, attributes the precipitous decline in sales to EPA's assertion of the right to revoke the Petrocoal waiver under section 211(f), and believes that sales of Petrocoal would rebound if the threat of section 211(f) proceedings were removed, even if EPA subsequently threatened to control or prohibit the marketing of Petrocoal under the substantively and procedurally more rigorous provisions of section 211(c). See id. at 88-89. One customer has committed to purchasing over $40,000 of American Methyl's product per month if the section 211(f) proceeding is terminated, see id. at 89; if it is not, American Methyl's business will continue to languish, because "in the eyes of the industry Petrocoal does not have a sufficient future to merit the risk of being caught with an inventory or of making the expenditures required to maintain Petrocoal apart from ordinary gasolines," id. at 88-89
 
 
 [32]
 See 49 Fed.Reg. 28,105 (1984) (notice of public hearing on proposed revocation)
 
 
 [33]
 See American Methyl Corp. v. Environmental Protection Agency, Nos. 84-1204 & 84-1277, at 1-2 (D.C.Cir. 27 July 1984)
 34 U.S. CONST. amend. V.
 
 
 [35]
 See Hayes v. United States Gov't Printing Office, 684 F.2d 137, 138 n. 1 (D.C.Cir.1982); Association of Inv. Brokers v. Securities & Exchange Comm'n, 676 F.2d 857, 863-64 & n. 20 (D.C.Cir.1982); Green v. Department of Commerce, 618 F.2d 836, 839 n. 9 (D.C.Cir.1980); cf. Northwest Airlines, Inc. v. Federal Aviation Admin., 675 F.2d 1303, 1308 (D.C.Cir.1982) (rejecting motions panel ruling on mootness)
 
 
 [36]
 See 18 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 4478, at 799 (1981) (observing that even some "jurisdictional" questions "may be protected by law of the case") [hereinafter cited as Wright & Miller]. But see Potomac Passengers Ass'n v. Chesapeake & O. Ry. Co., 520 F.2d 91, 95 n. 22 (D.C.Cir.1975)
 
 
 [37]
 EPA asserts that United American Fuels, Inc., the intervenor aligned with American Methyl, is also estopped from challenging the agency's asserted authority to revoke the Petrocoal waiver. In light of our holding that American Methyl is not estopped, we do not reach EPA's contention that failure to estop United American Fuels would relieve American Methyl of the estoppel it supposedly should bear
 
 
 [38]
 48 Fed.Reg. 19,779, 19,780 (1983) (request for comments on petition for reconsideration of Petrocoal waiver)
 
 
 [39]
 See App. II at 53, 53 (letter of counsel dated 20 Apr.1984). American Methyl formally challenged EPA's asserted revocation authority on 3 May 1984. See App. I at 31, 32 (request by American Methyl to EPA for rescission of reconsideration and proposed revocation of Petrocoal waiver)
 
 
 [40]
 See Joint Motion for Remand of the Record, Motor Vehicle Mfrs. Ass'n v. Environmental Protection Agency, Nos. 81-2276 & 81-2279 (D.C.Cir. remanded to agency 3 Apr. 1984)
 
 
 [41]
 See 48 Fed.Reg. at 19,780 (1983)
 
 
 [42]
 See 49 id. at 11,879, 11,879 (1984) (notice of reconsideration and proposed revocation of Petrocoal waiver pursuant to section 211(f))
 
 
 [43]
 See supra note 39
 
 
 [44]
 Detriment is a necessary prerequisite to application of equitable estoppel. See Heckler v. Community Health Servs., --- U.S. ----, 104 S.Ct. 2218, 2223, 81 L.Ed.2d 42 (1984); Davis v. Wakelee, 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895); Insurance Co. v. Wilkinson, 80 U.S. (13 Wall.) 222, 233, 20 L.Ed. 617 (1872); Alley v. Hotel, 551 F.2d 442, 446 (D.C.Cir.), cert. denied, 431 U.S. 958, 97 S.Ct. 2684, 53 L.Ed. 277 (1977); McDade v. Hampton, 469 F.2d 142, 144 (D.C.Cir.1972) (per curiam); Brown v. Lamb, 414 F.2d 1210, 1212 (D.C.Cir.1969) (per curiam), cert. denied, 397 U.S. 907, 90 S.Ct. 904, 25 L.Ed.2d 88 (1970); Kondo v. Katzenbach, 356 F.2d 351, 357 (D.C.Cir.1966), rev'd on other grounds, Honda v. Clark, 386 U.S. 484, 87 S.Ct. 1188, 18 L.Ed.2d 244 (1967); Jamison v. Garrett, 205 F.2d 15, 17 (D.C.Cir.1953); Galt v. Phoenix Indem. Co., 120 F.2d 723, 726 (D.C.Cir.1941); D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES Sec. 2.3, at 42-43 (1973); H. MCCLINTOCK, HANDBOOK OF THE PRINCIPLES OF EQUITY Sec. 31, at 80 (2d ed. 1948); 3 J. POMEROY, A TREATISE ON EQUITY JURISPRUDENCE Sec. 805, at 191-92 (S. Symons 5th ed. 1941); id. Sec. 812, at 230-32; cf. International Org. of Masters, Mates & Pilots v. Brown, 698 F.2d 536, 551 (D.C.Cir.1983) (estoppel against government)
 EPA points out that the doctrine of "judicial estoppel" permits a party to be estopped regardless of detrimental reliance. The one decision in this circuit addressing judicial estoppel, Konstantinidis v. Chen, 626 F.2d 933 (D.C.Cir.1980), points out that this doctrine " 'reflects the minority viewpoint which has encountered inhospitable reception outside the State of Tennessee.' " Id. at 938 (quoting Parkinson v. California Co., 233 F.2d 432, 437-38 (10th Cir.1956)). Thus, although Konstantinidis concerned District of Columbia law, this court was wary of the wisdom of a doctrine so " 'out of harmony with [the modern rules of pleading]' " and at odds with the truth-seeking function of courts of law. Id. (quoting Parkinson v. California Co., 233 F.2d at 438 (brackets in original)). We need not determine the merits of "judicial estoppel" in this case, however, for even those jurisdictions recognizing the doctrine limit it to cases in which a party prevails on a claim in one court and proceeds in a calculated manner to manipulate a second court by asserting facts at odds with those advanced before the first court. See id. at 938-39. Neither initial success before a prior court nor deliberate manipulation are evident on this record.
 
 
 [45]
 Clean Air Act Sec. 307(d)(9)(C), 42 U.S.C. Sec. 7607(d)(9)(C) (1982)
 
 
 [46]
 --- U.S. ----, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)
 
 
 [47]
 Id. 104 S.Ct. at 2782 (footnote omitted)
 
 
 [48]
 Federal Election Comm'n v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)
 
 
 [49]
 Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc., 104 S.Ct. at 2782 (footnote omitted); accord, General Motors Corp. v. Ruckelshaus, 742 F.2d 1561 at 1566 (D.C.Cir.1984) (en banc); see Environmental Protection Agency v. National Crushed Stone Ass'n, 449 U.S. 64, 83-84, 101 S.Ct. 295, 306-07, 66 L.Ed.2d 268 (1980); American Petroleum Inst. v. Costle, 665 F.2d 1176, 1184 (D.C.Cir.1981), cert. denied, 455 U.S. 1034, 102 S.Ct. 1737, 72 L.Ed.2d 152 (1982); Lead Industries Ass'n v. Environmental Protection Agency, 647 F.2d 1130, 1147 (D.C.Cir.), cert. denied, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980)
 
 
 [50]
 Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 104 S.Ct. at 2782 n. 9
 
 
 [51]
 We of course intimate no view as to EPA's power to revoke a waiver obtained through fraud, ex parte contacts, or other misconduct tainting the original record and thereby affecting the integrity of an agency's proceedings. See Alberta Gas Chemicals, Ltd. v. Celanese Corp., 650 F.2d 9, 12-13 (2d Cir.1981). Nor do we decide that EPA lacks authority to reconsider waivers within the 180-day period prescribed by statute after which a waiver application not acted upon is deemed granted by default. See Clean Air Act Sec. 211(f)(4), 42 U.S.C. Sec. 7545(f)(4) (1982). None of these circumstances is before us on this appeal: EPA alleges no misconduct in American Methyl's securing of the Petrocoal waiver; the agency did not propose to revoke the Petrocoal waiver until nearly two-and-one-half years had elapsed after the original grant
 
 
 [52]
 S.REP. NO. 127, 95th Cong., 1st Sess. 91 (1977) (emphasis added), reprinted in 3 LEGISLATIVE HISTORY, supra note 8, at 1371, 1465
 
 
 [53]
 Brief for Respondent at 14 n. 19
 
 
 [54]
 Clean Air Act Sec. 211(f)(4), 42 U.S.C. Sec. 7545(f)(4) (1982)
 
 
 [55]
 This, we believe, is the import of the cases EPA cites in support of its inherent authority to reconsider waivers of section 211(f). See United States v. Sioux Tribe, 222 Ct.Cl. 421, 616 F.2d 485, 493, cert. denied, 446 U.S. 953, 100 S.Ct. 2920, 64 L.Ed.2d 810 (1980); Hercules Inc. v. Environmental Protection Agency, 598 F.2d 91, 129 (D.C.Cir.1978); Spanish Int'l Broadcasting Co. v. Federal Communications Comm'n 385 F.2d 615, 621 (D.C.Cir.1967); Albertson v. Federal Communications Comm'n, 182 F.2d 397, 399-400 (D.C.Cir.1950). EPA cites one other case on this point, but that court found reconsideration appropriate in light of fraud allegations which affected the integrity of the agency's proceedings, see Alberta Gas Chemicals, Ltd. v. Celanese Corp., 650 F.2d 9, 12-13 (2d Cir.1981), an issue not before us today and on which we venture no opinion, see supra note 51
 
 
 [56]
 2A J. SUTHERLAND, STATUTES AND STATUTORY CONSTRUCTION Sec. 47.24, at 127 (C. Sands 4th ed. 1973) (quoting H. BROOM, A SELECTION OF LEGAL MAXIMS 453 (10th ed. 1939))
 
 
 [57]
 See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 14-15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981); Texas Indus. v. Radcliffe Materials, Inc., 451 U.S. 630, 639-40, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981); Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 19-20, 100 S.Ct. 242, 246-47, 62 L.Ed.2d 146 (1979); Tennessee Valley Auth. v. Hill, 437 U.S. 153, 188, 98 S.Ct. 2279, 2298, 57 L.Ed.2d 117 (1978); National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers (Amtrak), 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); Nashville Milk Co. v. Carnation Co., 355 U.S. 373, 375-76, 78 S.Ct. 352, 353-54, 2 L.Ed.2d 340 (1958); Botany Worsted Mills v. United States, 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929). This circuit has also had occasion to invoke this doctrine, see Lowenstern v. International Ass'n of Machinists and Aerospace Workers, AFL-CIO, 479 F.2d 1211, 1214 (D.C.Cir.1973), though on the whole we have rejected it in specific applications, see Wachovia Bank & Trust Co., N.A. v. National Student Marketing Corp., 650 F.2d 342, 354-55 (D.C.Cir.1980), cert. denied, 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981); United Steelworkers v. Marshall, 647 F.2d 1189, 1232 (D.C.Cir.1981), cert. denied, 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981); United States v. Exxon Corp., 628 F.2d 70, 75 (D.C.Cir.), cert. denied, 446 U.S. 964, 100 S.Ct. 2940, 64 L.Ed.2d 823 (1980); National Petroleum Refiners Ass'n v. Federal Trade Comm'n, 482 F.2d 672, 676 (D.C.Cir.1973), cert. denied, 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974); Carter v. Panama Canal Co., 463 F.2d 1289, 1299-1300 (D.C.Cir.1972), prompting the Supreme Court to reverse this court on one occasion, see Potomac Passengers Ass'n v. Chesapeake & O.Ry.Co., 475 F.2d 325, 331-32 (D.C.Cir.1973), rev'd, National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers (Amtrak), 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974)
 
 
 [58]
 E. CRAWFORD, THE CONSTRUCTION OF STATUTES Sec. 195, at 334 (1940). The exclusion-by-implication logic applies outside the context of statutory construction. See Evans v. Newton, 382 U.S. 296, 310-11, 86 S.Ct. 486, 494, 15 L.Ed.2d 373 (1966) (White, J.) (trust instrument); 2A J. SUTHERLAND, supra note 56, Sec. 47.24, at 127. But cf. Standefer v. United States, 447 U.S. 10, 20 n. 12, 100 S.Ct. 1999, 2006 n. 12, 64 L.Ed.2d 689 (1980) (declining to apply doctrine to an omission in a committee report when the result would contravene "the plain meaning of a statute")
 
 
 [59]
 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974)
 
 
 [60]
 Id. 414 U.S. at 458, 94 S.Ct. at 693 (quoting Botany Worsted Mills v. United States, 278 U.S. 282, 289, 49 S.Ct. 129, 132, 73 L.Ed. 379 (1929))
 
 
 [61]
 See Certified Color Mfrs. Ass'n v. Mathews, 543 F.2d 284, 296 (D.C.Cir.1976) ("It is a fundamental rule of statutory construction that legislative enactments be construed in a manner designed to give effect to all parts while avoiding a result contrary to the apparent intent of the Congress." (footnote omitted))
 
 
 [62]
 Clean Air Act Sec. 211(f)(1), 42 U.S.C. Sec. 7545(f)(1) (1982)
 
 
 [63]
 Id. Sec. 211(c)(1), 42 U.S.C. Sec. 7545(c)(1)
 
 
 [64]
 Id. Sec. 211(f)(4), 42 U.S.C. Sec. 7545(f)(4)
 
 
 [65]
 See Brief for Respondent at 13-14 n. 19
 
 
 [66]
 See id. at 15 n. 12; see also Brief of Intervenors Motor Vehicle Manufacturers Association at 4 (supporting same construction of revocation authority)
 
 
 [67]
 Brief for Respondent at 15 n. 21
 
 
 [68]
 EPA did not act on Motor Vehicle Manufacturers Association's petition for reconsideration; only when MVMA filed a supplemental petition reporting new data on evaporative emissions did EPA decide to solicit comments on whether to propose revocation of the Petrocoal waiver. See supra p. 829
 
 
 [69]
 See 48 Fed.Reg. 19,779, 19,780 (1983) (request for comments on petition for reconsideration of Petrocoal waiver)
 
 
 [70]
 See 49 id. at 11,879, 11,880-86 (1984) (notice of reconsideration and proposed revocation of Petrocoal waiver)
 
 
 [71]
 See id. at 11,880; 48 id. at 19,779, 19,780 (1983) (request for comments on petition for reconsideration of Petrocoal waiver)
 
 
 [72]
 49 id. at 11,879, 11,885 (1984) (emphasis added) (notice of reconsideration and proposed revocation of Petrocoal waiver); accord, id. at 11,880
 
 
 [73]
 Id. at 11,885 n. 12 (emphasis added)
 
 
 [74]
 When pressed on this point at oral argument, counsel for EPA suggested that any new evidence sheds light on the original decision and therefore justifies reconsideration. The limits on EPA's implied revocation authority begin to resemble a semantic smokescreen, for under this view any evidence warrants reconsideration of the original waiver
 
 
 [75]
 See 49 Fed.Reg. 11,879, 11,884, 11,886 (1984) (notice of reconsideration and proposed revocation of Petrocoal waiver)
 
 
 [76]
 See App. II at 30, 35 (Motor Vehicle Manufacturers Association's petition for reconsideration of Petrocoal waiver)
 
 
 [77]
 See 49 Fed.Reg. 11,879, 11,886 (notice of reconsideration and proposed revocation of Petrocoal waiver)
 
 
 [78]
 See id. at 11,880, 11,884-85; 48 id. at 19,779, 19,780 (1983) (request for comments on petition for reconsideration of Petrocoal waiver)
 
 
 [79]
 App. I at 63, 68 (citation and footnote omitted)
 
 
 [80]
 See Brief for Respondent at 22 n. 30
 
 
 [81]
 44 Fed.Reg. 37,074, 37,077 (1979) (notice of grant of waiver to Sun Petroleum)
 
 
 [82]
 See 45 id. at 75,755, 75,756 (1980) (notice of denial of petition for reconsideration of waiver to Sun Petroleum)
 
 
 [83]
 Id. at 75,757 (emphasis added)
 
 
 [84]
 EPA counters that its reference to section 211(c) in the Sun Petroleum case "was meant to encourage continuing research ... [i]t did not preclude EPA from reconsidering the waiver under section 211(f)." Brief for Respondent at 27. This explanation is puzzling, however, because proclamation of EPA's "revocation" authority under section 211(f) would also have encouraged research: In either case General Motors and other automobile manufacturers would have had an incentive to challenge Sun Petroleum's continued marketing of its alcohol/basoline blend to forestall possible customer dissatisfaction with damaged emission control systems and attendant warranty claims
 
 
 [85]
 In extreme cases, longstanding agency practice contrary to its current interpretation of its statutory powers deprives that construction of the deference traditionally due. See Bankamerica Corp. v. United States, 462 U.S. 122, 103 S.Ct. 2266, 2271-72, 76 L.Ed.2d 456 (1983) (Department of Justice and Federal Trade Commission's sixty-year failure to prosecute interlocking directorates under Clayton Act Sec. 8 suggests a lack of power in fact)
 
 
 [86]
 See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 104 S.Ct. 2778, 2792-93 (1984)
 
 
 [87]
 In this case, for example, the chief executive officer of American Methyl asserts that "methanol ... provides the nation with the best opportunity to develop a significant fuel supplement to gasoline." Affidavit of Ronald Eames, App. I at 84, 85. Without passing on the validity of the assertion, such innovative alternatives to traditional sources of energy provide a possible means of freeing ourselves from inherently polluting fossil fuels and an important route to independence from foreign sources of petroleum
 
 
 [88]
 S.REP. NO. 127, 95th Cong., 1st Sess. 90 (1977), reprinted in 3 LEGISLATIVE HISTORY, supra note 8, at 1371, 1464